( Decided January 21st, 1863.)

---

GEORGE W. WEEMS *vs.* GEORGE WEEMS AND MARGARET JONES.

At law, the right of a husband to release a legacy bequeathed to his wife, so as to bar her interest in it, is indisputable.

This power of a husband over money to which the wife might become entitled by bequest, does not appear to have been restricted in this State by any Legislative Act, until it was suspended by 1 Code, Art. 45, sec. 2, which provides that the property bequeathed to the wife shall be held for her separate use.

The provisions of the Act of 1853, ch, 245, operated to protect the property of a wife thus acquired, from the creditors of the husband, but did not effect the husband's marital rights or power over it.

Where the probate of a will is resisted by caveat, a husband releasing to the executor a legacy to his wife under said will, is thereby rendered a competent witness for the executor.

In general, the mere naked opinions of persons not occupying the position of professional medical attendants, as to the testamentary capacity of a testator whose will may be controverted, are not admissible. But where the witness was a brother of the testator, engaged with him in conducting a joint business, the intimacy of the witness with the testator having continued during the life of the latter, with the consequent opportunities for judging of the testator's mind, and of changes in its condition, it can scarcely be said that his opinion, being the result of actual knowledge, was not admissible.

APPEAL from the Orphans' Court of Baltimore city.

This is an appeal from an order of the Orphans' Court of Baltimore city, passed on the 29th of October 1860, sustaining a *caveat* to the will of Gustavus Weems, deceased, and refusing to admit said will to probate. The case is stated in the opinion of this Court. The following is, in substance, the testimony taken on both sides, as to the physical and mental condition of the testator for some time previous to and at the execution of the will referred to in the opinion of this Court, "reduced to writing in the presence of the attorneys for the caveators and for the executor, and at their request," and signed by the respective witnesses:

*Thomas L. Hughes,* one of the subscribing witnesses to the will, called for examination by the caveators, testified: That on going into the chamber of the testator, about half an hour before the will was executed, he did not know the witness, but after some time recognized and spoke to him; that the will was read to the deceased in the presence of the witness, by E. G. Leitch, who, when he read that portion of the will where there was a disposition of $700 to Mrs. M. L. Weems, asked if that was what he wanted, when the testator replied that it was; that Leitch then kept on reading the will, and when he had finished it, asked the testator if that was "right," or "what he wanted," and the testator replied that it was; that the testator was very weak, and when he executed the will, had to be held or propped up in bed; that the witness was not "judge enough to know what was the mental condition of the testator," but that he appeared to him to know what he was doing; that he had no conversation with the testator until he was about leaving, when he shook hands with him and said "good-bye, Mr. Weems," when he replied, "good-bye, Mr. Hughes;" that he had known the testator about three years; that in regard to the statement made

by Leitch, (that from ten to fifteen minutes before the exe-
cution of the will, he asked the testator, in order to test
his recollection, what disposition he had made of his pro-
perty, and that the testator made a reply which satisfied
him, Leitch, that the testator's recollection had failed him,)
that the circumstances referred to did not take place in the
presence of the witness, and that he thought Leitch was mis-
taken as to their having taken place ten or fifteen minutes
before the execution of the will; that the witness was re-
quested to attend at the execution of the will by Samuel
Taneyhill, one of the subscribing witnesses; that neither
the witness nor any other person, when he was present, was
asked by the testator to sign his will as witness; that Ma-
son Weems, George Weems, Samuel Taneyhill and E. G.
Leitch were present; and that the witness was under the
impression that he left the room before Leitch.

*Edward G. Leitch,* one of the subscribing witnesses to
the will, proved: That he had known the testator inti-
mately, as a friend and social acquaintance, for about
twenty years before the making of the will; that the only
property held by him at the time of his death, as far as
the witness knew, was personal property, being a general
interest with his brothers in the steamboat business; that
he received the instructions of the testator for his will
about ten or eleven o'clock on the day on which it was
made, and that the instructions were, that he gave to his
brother Mason Weems' wife $700, and the balance of all
his estate to his brother George; that ten or fifteen minutes
before the execution of the will, the witness asked the tes-
tator, in order to test his recollection, what disposition he
had made of his property, when he replied that he had
given his brother Mason $500, George $500, and Theodore
$500, which satisfied the witness that his recollection had
failed; that at the time of making the latter statement, in
the opinion of the witness, he was not competent to make

a valid deed or contract; that when he gave the instruc-
tions for making his will, he was perfectly competent to
make a valid deed or contract, but that at the time of the
execution of the will, between four and five o'clock in the
evening of the same day, he was not so competent; that
after making the inquiry as before stated, and before the
execution of the will, he asked the testator what he was
about doing, when he replied that he was about to sign
his will, and asked witness where to make his mark; that
he had no further conversation with the testator, except to
bid him farewell, when leaving; that he visited the testa-
tor to advise him to make a disposition of his effects, at
the instance of George W. Weems, his brother, at whose
house he had been staying during his last sickness.

*Henry M. Wilson*, a witness for the caveators, testified:
That he attended the testator as his physician during his
last illness, and visited him twice daily, from the 29th of
June to 6th of July 1859, except on the 2nd of July, when
he saw him three times; that his disease was an obscure
affection of the stomach, and his condition such as to pre-
clude all hopes of his recovery; that as his disease increased
in severity, his strength decreased; that his mind seemed
to be torpid in its action; that witness saw him on Sunday,
at ten or half-past ten o'clock, in consultation with Dr.
Buckler, when he was exceedingly prostrated, also at half-
past three, and again at about seven o'clock; that on the
last occasion, he was called on to witness the will of the
testator, but upon a conversation with him, considered his
mental condition such as to unfit him for making a will,
and declined to be one of the witnesses thereto; and that
in the opinion of the witness he was not then capable of
executing a valid deed or contract.

*Zilpah Hosking* testified: That she attended upon the tes-
tator for one month previous to his death, as a nurse; that
on the Saturday before his death, he seemed to be perfectly

prostrated, and from that time grew worse and worse; that his mind seemed to grow weaker as his body grew weaker; that he was often in a listless state; that on the morning of the Sunday on which the will was executed, his mind seemed to wander, that is, the witness would ask him a question, and he would answer some time after, and then again would answer the same question differently, and that he would frequently ask where his brother Theodore was, though told each time that he had gone down the river on Saturday, which the testator, when well and in his right mind, knew was generally the case on Saturday; that witness did not think that on Sunday the testator's mental faculties were in a fit state to make a will; that the testator seemed to be aware that his memory was giving away, for he used to call upon the witness to observe particularly, saying that his sufferings were so great that he could not remember so as to tell the doctors his symptoms.

*Mason L. Weems* being called on the part of the executor, and objected to as incompetent by the caveator, the following release was filed:

· "I, Mason L. Weems, do hereby assign and release unto my brother, George W. Weems, the legacy of seven hundred dollars, bequeathed unto my wife, Matilda, by my brother, Gustavus Weems, in and by his last will and testament, made the 3rd of July 1859. Witness my hand and seal, this 29th of November 1859.

M. L. WEEMS,    (Seal.)

. "Witness present—*B. M. Heighe.*"

The said witness being sworn, (his competency being still objected to by the caveator, notwithstanding the release,) testified: That he saw his brother, the testator, on the Saturday previous to his death, and was with him from early that evening until three o'clock of Sunday morning, but did not discover that his mind was in the least impaired, though he was growing weaker and weaker in

body; that when he left him, he called his brother George, and believes he went to him; that Mrs. Hosking was asleep in the adjoining room until he left; that witness returned to the house about nine o'clock on Sunday morning, but perceived no change in the mind of the testator, although he was growing weaker in body; that witness was present when Leitch came in, and it was suggested that he, Leitch, should make known to the testator his situation, and ask him in what manner he wished to dispose of his property; that witness was present when the will was signed, and the testator seemed perfectly aware of what he was doing; that the testator had some conversation with one of the witnesses just before signing the will, and seemed perfectly rational, and asked one of them about an accident that had happened to him; that the will was read to him by Leitch, and he seemed to understand all about it, though he said nothing; that in the opinion of the witness, at the time of the interview with Leitch in the morning, the testator was competent to execute a valid deed or contract, but that he was *not* in the evening; that witness noticed for the first time, on Sunday afternoon, that the testator's mind was a little wandering, and that he seemed to be very weak and forgetful; that the witness was present during a visit from a minister of the gospel to the testator, after the interview between him and Leitch, and before the signing of the will; that the minister questioned him about the future, and his answers were rational, and when the minister offered up prayers he responded; that the minister administered the sacrament to him; and that the testator labored under no delusion that witness knew of. The testimony of this witness, so far as relates to his opinions as to the condition of the testator's mind, for which no reason was assigned, was objected to by the counsel of the caveator.

*Theodore Weems*, a witness on behalf of the executor, testified: That he was with his brother, the testator, on

the Friday evening preceding his death, and that he was then rational; that witness did not know what disposition the testator designed making of his property, but that witness held a note of their brother George, and that the testator had told him that he would make it right, that George need not trouble himself about it, for he would see to it; that this occurred when the three were purchasing the "Planter;" that witness knew that the disposition of the testator was to give what he had to George, though he had never heard him say so, "because the rest of us were better off than George."

*Samuel Chew*, examined on behalf of the executor, testified: That he attended the testator in his last sickness from the 5th to the 28th of June; that witness left the city on the 29th of June, and returned on the 5th of July, and again visited the testator twice on the 6th of July; that from the 5th to the 28th of June, the testator was very silent and uncommunicative, but witness saw nothing indicating a want of intellect, and was of opinion that during that period he was competent to execute a valid deed or contract; that diseases producing extreme physical prostration, generally, after a time, enfeeble the mind, but not always.

*William Hirst*, examined on behalf of the executor, testified: That he called to see the testator at the instance of Henry M. Wilson, about the 1st or 2nd of July, and found him ill, and conversed with him on the subject of religion; that the testator said but little, only answering the questions propounded to him on that subject, his answers being all rational, as far as the witness discovered; that he visited him again the next day, and again on the Sunday following, when he administered to him the Sacrament of the Lord's Supper; that to the best of witness' recollection, this was on Sunday the 3rd of July, in the evening; that the answers to the questions propounded to him in regard

to the sacrament and its nature, seemed reasonable, so much so that witness deemed him a fit subject for its reception; that witness visited him once again the following day, when he appeared better, and to have revived; that witness had no conversation with the testator except on the subject of religion, and that the interview on Sunday evening lasted about fifteen or twenty minutes, and was between half-past four and half-past six.

The cause was argued before BARTOL, GOLDSBOROUGH and COCHRAN, J.

*G. W. Dobbin* and *T. Parkin Scott,* for the appellant:

It is not contended that the testator was ever a lunatic, or insane, or under the influence of any delusion, but that he was enfeebled and broken down in body in such a degree as to impair his intellect, and render him incompetent to make a will. The first inquiry is, what degree of capacity is required to make a will? See *Ray's Med. Jurisp. of Insanity,* secs. 344, 352 to 354. 4 *Wash. C. C. Rep.,* 267, 269.

We contend that the testator was *compos mentis,* and capable of making a valid will at the time when he gave directions for the drawing of his will. *Ray on Insanity, secs.* 35, 99, 109, 229 to 235, and 255. *Watkins vs. Stockett,* 6 *H. & J.,* 443, 444. *Brooke vs. Townsend,* 7 *Gill,* 27 to 32. *Allen vs. Manning,* 2 *Eng. Eccl. R.,* 160, 369, 370. (1 *Addam's,* 229.) 3 *Md. Rep.,* 501. 1 Code, Art. 93, secs. 300, 306. *Plater vs. Groome,* 3 *Md. Rep.,* 143, 145. *Wms. on Exrs.,* 35, 59. *Stewart vs. Redditt,* 3 *Md. Rep.,* 78, 79. *Stewart, Adm'r of Seward, vs. Spedden,* 5 *Md. Rep.,* 446.

The evidence also shows that the testator was *compos mentis* after the execution of the will. The whole estate was personal; therefore the will is good if he was *compos mentis* when the directions were given, although he may

have lost his mind before signing the will. *Plater vs. Groome,* 3 *Md. Rep.,* 143, 145. Lastly, the will is reasonable, and in accordance with the previously expressed intentions of the testator.

*S. Teakle Wallis* and *John H. Thomas,* for the appellees, argued:

1st. That Gustavus Weems was clearly not possessed of testamentary capacity when the alleged will professes to have been made.

2nd. That he was not possessed of testamentary capacity when the instructions for it were given.

3rd. That the unsupported opinions of the two unprofessional witnesses, who think he had not lost his faculties when the instructions were given, are entitled to no weight. The opinion of Mrs. Hosking to the contrary,—sustained by the conclusive reasons assigned for it,—taken in connection with the fact that the alleged will is not such as the testator would have been likely in his senses to make, and that there was no change in his condition between the time when an intelligent physician found that his mind was gone, and that at which the instructions were given, ought conclusively to determine this question. *Brooke vs. Townsend,* 7 *Gill,* 24, 27. *Stewart vs. Redditt,* 3 *Md. Rep.,* 67, 78. *Dorsey vs. Warfield,* 7 *Md. Rep.,* 65, 73.

4th. That the paper wants all the requisites necessary to make it a valid nuncupative will. Act of 1810, ch. 34. *Dorsey vs. Shepard,* 12 *G. & J.,* 198. *Welling vs. Owings,* 9 *Gill,* 468.

That no paper has ever been sustained as a written will by the Courts of our country, which had not been executed by the testator when he had proper testamentary capacity, unless the identical paper had been read to or by the testator, and approved of by him as his will, or as a proper memorandum of instructions for it, before he lost his facul-

tics. *Mason vs. Dunman,* 1 *Munford,* 456, 458. *Rochelle vs. Rochelle,* 10 *Leigh,* 137, 138, 139 and 140. *Hathorn vs. King,* 8 *Mass.,* 372. *Boofter vs. Rogers,* 9 *Gill,* 44.

That if a paper, under the circumstances proved in this case, can be established as a written will, it destroys the policy of the law as to nuncupative wills. It cannot be, that words intended by a dying man to be his final and complete will, need to be proven in a certain way by three witnesses, in whose presence they were uttered, and that similar words when intended only as instructions for the preparation of a will, to be afterwards approved and formally executed by him, can be established as his will upon the testimony of one witness only. If so, the law which requires a nuncupative will to be attested by three witnesses, and afterwards reduced to writing, to guard against perjury or mistake, can easily be evaded by one witness swearing that he heard words uttered, not as a will, but as instructions for one, and having a paper containing such words signed by a man after his mind is gone, and attested by three witnesses. The signature or execution under such circumstances, cannot possibly give any additional sanction to the paper.

COCHRAN, J., delivered the opinion of this Court:

This appeal is from an order of the Orphans' Court for Baltimore city, refusing to admit to probat a paper purporting to be the last will and testament of Gustavus Weems. The testator, whose estate consisted of personal property, left three brothers, Mason L. Weems, Theodore Weems, George W. Weems, the appellant, a sister, Margaret Jones, and George Weems, the son of a deceased brother, caveators and appellees.

The alleged grounds of objection to the probat of the will, were, that the testator was not possessed of a sound disposing mind at the time of executing the paper pro-

pounded as his will, and that he did not at that time know nor understand its provisions and contents.

Among the undisputed facts in the case, we find that the testator, who had become greatly enfeebled in body and mind, by long continued and severe illness, gave instructions, on the morning of the 3rd of July 1859, for the preparation of his will; that the paper propounded as such was prepared in accordance with the instructions given, and executed by him late in the evening of the same day. The life of the testator terminated on the 6th of July, three days after the execution of that paper.

Evidence was taken on both sides, to show the physical and mental condition of the testator for some time previous to and at the time he executed the will.

Mason L. Weems, after executing a release of his wife's legacy to the executor, was examined by him as a witness, under an objection taken by the caveators to his competency, on the ground of interest. His opinion as to the testator's testamentary capacity, offered as a part of his evidence, was also objected to, on the ground that the facts and circumstances upon which it was founded, were not stated. The competency of this witness depends upon the effect of his release of the legacy to the executor. In our opinion, the execution of that instrument must be considered as effecting an absolute and complete extinguishment of all right to the legacy under the will. At law, the right of a husband to release a legacy bequeathed to his wife, so as to bar her interest in it, is indisputable. *Chamberlain vs. Hewson,* 1 *Salk.,* 115. *Gray vs. Acton, Ib.,* 325. 4 *Viner,* 44. *Shep., Touch.,* 333. This power of a husband over money to which the wife might become entitled by bequest, does not appear to have been restricted in this State by any Legislative Act, until it was suspended by the 2nd sec. of Art. 45 of the Code, which provides that property bequeathed to a wife shall be held for her

separate use.   The provisions of the Act of 1853, ch. 245, operated to protect the property of a wife thus acquired from the creditors of the husband, but did not affect the husband's marital rights or power over it.   *Schindel vs. Schindel,* 12 *Md. Rep.,* 294.   We think the release of the legacy in this case, rendered the husband of the legatee a competent witness for the executor, and that his evidence must be admitted.   The principle upon which the appellees objected to the opinions of the witness as evidence of the testator's capacity, must be admitted, for in general, the mere naked opinions of persons not occupying the position of professional medical attendants, as to the testamentary capacity of a testator whose will may be controverted, are not admissible.   *Brooke vs. Townsend,* 7 *Gill,* 27.   *Dorsey vs. Warfield,* 7 *Md. Rep.,* 73.   But this is a case in which the principle relied on does not apply.   The witness was the brother of the testator, and they, with the other brothers, had been and were engaged in conducting a joint business, though their interests might have been several.   The intimacy of the witness with the testator having continued during the life of the latter, and afforded opportunities for judging of the testator's mind, and of changes occurring in its condition, it can scarcely be said that his opinion, being the result of actual knowledge, was not admissible.   It is not necessary, however, to rely on these considerations alone, as the witness has stated in his testimony facts and circumstances sufficiently fortifying his opinion to render it competent evidence.

The witnesses, Weems, Leitch, and Dr. Wilson, offer not only their opinions as to the testator's capacity at the time of executing the will, but state the particular circumstances and facts upon which their opinions were founded; and their evidence as to the condition of the testator at that time, is strongly supported by that of the other witnesses. The opinion of Dr. Wilson was formed after he had ex-

amined the testator for the sole purpose of determining his mental condition, and that of Leitch by the testator's answers to questions in regard to the disposition of his property by the will prepared under his instructions, put for the purpose of testing his understanding and memory. From the evidence of these witnesses, considered with that of Mrs. Hosking, we must conclude that the testator did not know nor understand the purport of the paper executed by him, and that from mental weakness and loss of memory, he was then incapable of making a rational disposition of his property, or of executing a valid will. His mind does not appear to have been subject to any hallucination or delusion, but the evidence shows that he was unable to remember in proper connection such facts as were necessary to the origination and execution of a rational testamentary purpose. This condition of the testator's mind was unquestionably induced by the severity of the disease from which he was suffering. On the preceding day his illness had much increased, and from the evidence of the physicians, we cannot doubt that at the time the will was executed, his increasing physical weakness had so involved and disturbed the operation of his mental faculties, that in contemplation of law, he was incapable of executing such an instrument. There is no evidence, however, that the testator's mind was so impaired before the persons called to witness the execution of the will, had been assembled. Apart from the presumption of law, that the testator was possessed of a sound mind until the contrary was proved, we think it appears from the evidence of his antecedent condition, that he was capable of making a valid will until the latter part of the day on which the will was executed. Dr. Wilson, although he had seen the testator professionally some two or three hours before, was careful to confine his testimony as to the testator's mental condition to the time when he was called to witness the

will, and to state that the weakness of the testator, conse-
quent upon his disease, had then become so manifest that
he thought a conversation with him was necessary to de-
termine whether his mind was in a fit condition to make a
will. Nothing in the previous condition of the testator
appears to have excited any suspicion of mental infirmity
or unsoundness, while on the other hand the witnesses,
with the exception of Mrs. Hosking, speak of his condition,
which they inferred from his conversation and conduct, as
entirely rational. Leitch, who had for a long time been
intimately acquainted with him, states that he received his
instructions for having the will prepared, in a conversation
which lasted some fifteen or twenty minutes, and that in
his judgment the testator was then perfectly competent to
make a valid deed or contract. The testimony of Mr.
Hurst, and that of Mason L. Weems, also tends to prove
the same fact. The latter says that he spent the greater
part of Saturday night with the testator, and was with him
on Sunday, and that he saw no change in the state of his
mind until about two or three o'clock of that day, when
he first observed that he seemed to be "very weak and for-
getful." The evidence of Mrs. Hosking, as to the state of
the testator's mind on Sunday morning, is not supported
by that of any other witness. The testator's listlessness,
whimsical questions, and complainings, undoubtedly gave
rise to her opinion that his mind was impaired, but these
manifestations may have been only those of a mind in pas-
sive sympathy with physical suffering, and not such as
would indicate its unsoundness when roused from that state
to the consideration of important subjects.

Looking to the whole evidence, we conclude that the tes-
tator had sufficient strength and soundness of mind to dis-
pose of his property by will when he gave instructions for
preparing the paper propounded as his will, and that he
actually intended to execute that paper when written as

his will, which intention, in the absence of any circumstance or evidence to the contrary, we must presume, continued until he was deprived of the capacity to execute such an instrument by what is technically described as the "act of God." Having determined from the evidence the material facts in the case, we have to consider whether, upon these facts, the paper propounded as the last will of Gustavus Weems, can be admitted to probat. It was objected in argument, that the admission of this paper to probat would be in violation of the purpose and policy of the Act of 1810, ch. 34. We do not think so. The design of that Act was not to restrict or defeat actual verbal bequests, but to declare and fix the extent and kind of evidence necessary to establish and make them effective. Taking into consideration the common infirmities of memory, and the tendency of witnesses to infer testamentary purposes from vague and uncertain words, and the fact that these circumstances tend to induce as well as afford facilities for setting up alleged verbal wills, in fraud of rightful distributees, the propriety of the Act is obvious; but it is difficult to perceive upon what ground either its purpose or policy, in requiring a given amount and kind of evidence to establish a verbal or nuncupative will, is violated by the probat of a written will prepared in accordance with the testator's instructions, but not completed by him, because of his subsequent deprivation of the legal capacity to execute it. The present case in no respect seems to be within the purview of the Act upon which that objection of the caveators was taken, and it must therefore be determined upon principles which govern cases where the testamentary purpose of executing particular wills, is prevented by the "act of God."

Upon the proof that this paper was drawn in accordance with the testator's instructions, the objection that it was not read to and approved of by him at a time when he had

capacity to understand and adopt it as his will, does not, in our opinion, defeat its operation as a valid testamentary paper. It was drawn by the testator's orders, and contains the particular bequests directed by him to be inserted, and although he may not have read or heard it read when he had capacity to understand and adopt it as his will, yet, if from all the evidence in the case, it is found to express his actual testamentary purpose, until he was deprived of that capacity, in principle, there would seem to be no objection to admitting it to probat. Most of the cases of unexecuted testamentary papers propounded for probat, have turned on the proof of the fact, that an actual testamentary purpose was expressed or indicated by the paper propounded, and not upon the particular kind of evidence by which that fact might be established.

The reading and approval by the testator of the paper prepared under his instructions, would be conclusive evidence upon which the paper would be entitled to probat as his will, but it by no means follows that such reading and approval was necessary, if from other evidence in the case it is shown to be the will he intended to execute, during the continuance of his capacity to do so.

In the case of *Plater vs. Groome*, 3 *Md. Rep.*, 143, the Court said, that to constitute a good will for personal property, "the paper must be either complete on its face, or it must appear, if incomplete or defective, that it was intended by the testator that it should operate as his will in its unfinished or imperfect state, or that he was prevented from completing the contemplated formalities by being overtaken by sickness or death, or some other casualty."

In the case of *Allen vs. Manning*, 2 *Eng. Eccles. R.*, 391, 2 *Addams*, 490, *note*, the instructions and draft of a will were propounded, the latter of which was objected to on the ground that the testator had never seen it, but the objection appears to have been overruled, and the draft of the

will, in place of the instructions, pronounced for by the Court. And where a legacy was inadvertently omitted from a properly executed will, the will was reformed in that respect, so as to admit payment of the legacy, upon proof that it was in accordance with the true mind and intention of the testator. *Bayldon vs. Bayldon*, 2 *Eng. Eccles. R.*, 509. The judgment of the Court of Appeals, in the case of *Barnes vs. Crouch*, at June term 1834, strongly supports the conclusion to which we have arrived. It appears from the statement of the case in *Dorsey's Test. Law*, 60, that the testator, Davis, gave verbal instructions as to the disposition of his property, and desired a magistrate to be called to prepare his will in accordance with them. The magistrate was called, and prepared the will in accordance with the instructions, as repeated to him out of the testator's hearing, and then took it to the testator's room, but it was neither read to nor executed by the testator, as he was then speechless and dying. That paper was then exhibited in the Orphans' Court, and by its order admitted to probat, which order was afterwards affirmed by the Court of Appeals. These facts are so far coincident with those in this case, that we can see no reason why the principle recognized in the determination of that case should not now govern us. It is true that the Court filed no opinion showing the particular grounds on which they affirmed the order of the Court below, but notwithstanding that fact, the case as finally adjudicated, in our opinion, constitutes a precedent and establishes a principle which we are not at liberty to disregard. In the present case, the verbal instructions of the testator were at his request formally and accurately expressed in the paper propounded as his will; and with evidence amply sufficient to justify the inference that the paper was prepared during the continuance of the testamentary purpose it expresses, though not completed for want of capacity to execute it, there is, in our

view of the authorities referred to, no apparent reason why it should not be permitted to have effect as a valid will.

Upon a careful consideration of the whole case, we must reverse the order of the Court below, and remand the case, the costs to be paid out of the estate, so that the paper propounded as the will of Gustavus Weems, may be admitted to probat, in accordance with this opinion.

*Order reversed, and cause remanded.*