(Decided December 14th, 1877.)

GEORGE A. WILLIAMS *vs.* CHARLES W. LEE, ANN ARCHER, and others.

TESTAMENTARY CAPACITY.

*Evidence of testamentary capacity—Attesting witnesses may dispute the capacity of a testator—Value of testimony of intimate personal friends as to testamentary capacity of a testator—Attesting witnesses need not state reasons for their opinions as to testamentary capacity of testator.*

Attesting witnesses are entitled to give their opinions of the testamentary capacity of a testator unaccompanied by any statement of facts or circumstances upon which they are founded.

The fact that a party has attested the execution of a will, does not prevent him from testifying to the actual mental capacity of the testator at the time of the execution, and what in point of fact he considered it to be.

Opinions which are the result of long and intimate personal acquaintance and familiar personal intercourse, and accompanied by such statement of facts on which they are founded as the witnesses are able to give, are clearly admissible in evidence to prove the testamentary capacity of a testator.

APPEAL from the Circuit Court for Harford County, in Equity.

On the 28th October, 1862, Charles W. Lee filed his bill against Priscilla Stump, and John H. Price and Henry W. Archer, her committee, by which he sought to obtain a decree to sell certain property of said Priscilla, for the payment of two sums of money due to him.

On the 11th May, 1863, the decree was passed as prayed.

On the 22nd May, 1865, Ann Archer filed her bill, in which she alleged, that on 16th August, 1865, her sister, the said Priscilla Stump, had died intestate, seized of large real estate, being the property known as "Stafford Mills Lot," with the appurtenances, containing 30 acres, more or less, and also other property. The bill enumerates the heirs-at-law and their relationship, avers that the property cannot be divided, and prays for a sale and distribution of proceeds.

On the 2nd October, 1865, a decree was passed, as prayed, appointing H. W. Archer, trustee. Subsequently, these cases were, by agreement, consolidated.

On 5th November, 1866, Ann Archer filed a supplemental bill, in which she sets forth that after the passage of the two decrees above mentioned, the consolidation of the cases and certain sales under said decrees, "a paper purporting to be the last will and testament of said Priscilla Stump was produced and offered for probate in the Orphans' Court of Harford County;" that the "oratrix has been informed that said paper is not the will" of the said Priscilla Stump; and that at and before the time of its date, and from that time until her death, she was *non compos mentis.*

"That under and by virtue of said pretended will, certain persons, hereinafter named, claim to have some interest in the estate of said deceased, and in the proceeds of sale thereof, as devisees and legatees of said Priscilla Stump; and your oratrix has been advised, that before

said decrees can be fully carried into execution, and the proceeds of sale be equitably distributed, it is necessary and proper that said legatees and devisees, and their legal representatives, be made parties to this case, so that their respective claims may be heard and determined."

The bill then sets forth the persons to be made parties, and prays for general relief.

On 20th July, George A. Williams, the appellant in this case, the devisee under the codicil of the will of Priscilla Stump, referred to in the last mentioned supplemental bill of Ann Archer, filed his answer, in which he avers that the said Priscilla, at the time of making and publishing said will and codicil, was not *non compos mentis*, but that on the contrary, she was fully competent to execute both the said will and the said codicil, and that she did fully execute and publish each of said instruments.

"The defendant further avers, that by virtue of the said codicil, he is entitled to the property described in said codicil as the Stafford Mills, at the death of Herman Stump, mentioned in said codicil ; and he asks that said will may be declared valid, and his rights established."

A very considerable amount of testimony was taken to sustain the allegations of the bill and answer.

On the 25th May, 1875, the Court decreed that both will and codicil were null and void, and that the proceeds arising from the sale of the estate of Priscilla Stump belonged to her heirs-at-law.

From this decree of the Court the present appeal was taken.

The cause was argued before BARTOL, C. J., BOWIE, BRENT, STEWART and MILLER, J.

*Robert A. Dobbin,* for appellant.

*Henry W. Archer,* for appellees.

Williams *vs.* Lee, *et al.*

MILLER, J., delivered the opinion of the Court.

Under proceedings in equity which need not be stated at length, the real estate of Priscilla Stump, deceased, was sold for the purpose of distribution amongst her heirs-at-law. After the sale two papers were offered for probate in the Orphans' Court purporting to be her will, and a codicil thereto. A supplemental bill was then filed in the equity cause, alleging the discovery of these papers, denying their validity for want of testamentary capacity, but bringing in and making defendants all parties who could claim as devisees or legatees thereunder. The parties thus brought in answered and averred that the deceased at the time she executed these papers, was fully competent to execute the same, and they were therefore valid testamentary dispositions of her property. On this question of capacity a mass of testimony was taken, upon which the Court below decreed the papers to be null and void, and directed the proceeds of sale to be distributed to the heirs-at-law; the appellant is the only party in interest who has taken an appeal from this decree, and he claims under the alleged codicil to the will. By that paper the deceased devised the "Stafford Mills" and land thereto attached, to her brother Herman Stump for life, and after his death, to her nephew, the appellant, in fee. The record shows that no exception was taken by the appellant, a defendant in the Circuit Court, to the jurisdiction of a Court of equity to determine the question of testamentary capacity, and in that case the Code, (Art. 5, sec. 27,) forbids any such objection to be made in this Court. Our decision in this case cannot therefore be construed as decisive of this jurisdictional question. What we are called upon to decide by this appeal is, was the Court below right in deciding upon the evidence before it, that the deceased had not testamentary capacity at the date of this codicil? To that end we have examined and considered the testimony in the record.

From this it appears that in July, 1847, Miss Stump was, under proper proceedings instituted for the purpose, found to be a lunatic, and her person and property placed in charge of a committee consisting of Judge John H. Price and Henry W. Archer, and so remained until her death in July, 1865. The inquisition states she was a lunatic without lucid intervals, incapable of managing her property and had been in the same state from 1845, and for how much longer the jurors know not, neither do they know how she became so unless by the visitation of God. The testimony discloses her mental condition for a long period prior as well as subsequent to this finding. The alleged will was executed in February, 1838, and the codicil in April, 1843, the former having been written by Dr. Worthington, the family physician, and the latter by Judge Price. These papers were left in the custody of Judge Price, who seems to have forgotten their existence and did not discover them until nearly a year after her death. There were three subscribing witnesses to each paper, and of these but two, Mr. Wiles, a witness to the will and afterwards a Judge of the Orphans' Court, and Judge Price, a witness to the codicil, survive and have testified in the case. Each of them without hesitation and with emphasis swears that on the respective dates of these papers she was, in his opinion, incompetent to execute a will. Their testimony is important and entitled to great weight. As attesting witnesses they were entitled to give their opinions unaccompanied by any statement of facts or circumstances upon which they were founded. But added to this, one of them, Judge Price, had a long and intimate acquaintance with the deceased. He knew her well from 1828 to the time of her death. He was closely connected by marriage with her and her family, and his position as one of her committee for eighteen years afforded him ample opportunity to know her mental condition. The fact that these gentlemen attested these papers,

whilst it affords *prima facie* evidence that they then considered her sane, does not prevent them from testifying as to her actual condition and what in point of fact they considered it to be, but rather tends to give greater force to their testimony now solemnly and explicitly given against her capacity. The reason why these papers were written and signed is also satisfactorily explained. It appears that many such papers had been previously written and executed and then destroyed : that she was constantly importuning her friends and relations to write such and other papers for her, and that they complied in order to humor her caprices and soothe and quiet her, and this is neither unreasonable nor unnatural. If her incapacity and unsoundness of mind was, as it appears to have been, well known to her family and intimate friends, and she could be gratified and quieted by going through the forms of preparing and executing such instruments, the fact that it was done may well be attributed to a laudable and natural wish on their part to indulge her, and keep her in her home and with her family as long as possible. But testimony of like character as to her mental imbecility before and at the time these papers were executed, is likewise given by her only surviving brother and sister and many other near relatives. They had abundant opportunity to form rational opinions upon this subject. These opinions were the result of long and intimate personal acquaintance and familiar personal intercourse, and are accompanied by such statement of facts on which they were founded as the witnesses are able to give, and in that case according to all the Maryland authorities, their testimony is not *mere opinion* but knowledge, and is clearly admissible in evidence. *Brook vs. Townshend,* 7 *Gill,* 10; *Weems vs. Weems,* 19 *Md.,* 334; *Waters vs. Waters,* 35 *Md.,* 531. But more than this, it is proved that she was in the constant habit of writing illegible and unintelligible scrawls which she called letters, and insisted upon sending or

importuning others to direct and send them to her friends
and acquaintances. Many of these written about the time
and before the dates of these alleged testamentary instru-
ments were offered in evidence. They have not been tran-
scribed into the record because they could not be deci-
phered, but they have been exhibited to us for our inspec-
tion. It is impossible to describe them in words, but com-
ing as they do from a lady of means and of a highly
respectable and wealthy family, who was tenderly nur-
tured by a careful and intelligent mother and father, they
bear the strongest intrinsic evidence of her extreme men-
tal imbecility if not idiocy. No more potent proof on that
subject could be adduced.

In short, without going into its further detail, it is clear
to us that the preponderance of testimony is altogether
against the testamentary capacity of this alleged testatrix
at the time these papers were executed. The only proof
or circumstance on the other side to which any weight can,
in our judgment be attached, is the fact that from 1833 to
1845, sundry mortgages, leases and conveyances were
made by and to her. But the fact is clearly shown that
all of them were made by the advice, approval or procure-
ment of her immediate relations and those who had charge
of her interests and property before the appointment of
her committee, and in most cases it is proved that without
such advice and consent the parties with whom her con-
tracts were made on her behalf, would not have entered
into them, and that in all cases they were fair and reason-
able and for her benefit. The question of the validity of
any of these instruments is not before us, and the fact that
they were executed under such circumstances detracts but
little from the force of the evidence showing her incapacity
to contract, and certainly does not overthrow it. We are
therefore well satisfied the decree appealed from should be
affirmed. Taking this view of the case, it becomes unne-
cessary for us to decide whether the alleged testatrix had

or not, at the date of its execution any devisable interest in the particular real estate purporting to be disposed of by this codicil.

*Decree affirmed, and*

*cause remanded.*

(Decided December 6th, 1877.)