## JOHN FRANCIS CONN *v.* STATE OF MARYLAND

[No. 15, September Term, 1978.]

*Decided January 16, 1979.*

The cause was argued before GILBERT, C. J., and MOYLAN and DAVIDSON, JJ.

*Bradford C. Peabody, Assistant Public Defender,* with whom was *Alan H. Murrell, Public Defender,* on the brief, for appellant.

*Alexander L. Cummings, Assistant Attorney General,* with whom were *Francis Bill Burch, Attorney General, Sandra A. O'Connor, State's Attorney for Baltimore County,* and *Gary P. Jordan, Assistant State's Attorney for Baltimore County,* on the brief, for appellee.

DAVIDSON, J., delivered the opinion of the Court.

On 10 July 1977, John Francis Conn, the appellant, was charged with murder. He entered pleas of not guilty and not guilty by reason of insanity. On 16 December 1977, in the Circuit Court for Baltimore County, a jury found that the

appellant was sane at the time of the commission of the crime and convicted him of murder in the first degree. We shall reverse.

The evidence shows that on 10 July 1977, at approximately 7:30 p.m., Iris Appel was found murdered. Her father saw the appellant running from the scene of the crime. At 8:00 p.m. that same night, the appellant was arrested by two Baltimore County police officers.

At trial one of the arresting officers, a lay witness, expressed an opinion, based upon his observations of the appellant shortly after the commission of the crime, that the appellant was not mentally ill. The appellant objected and moved to strike. The record shows that the following exchange took place:

> "Q. [State's Attorney] Can you describe to the ladies and gentlemen of the Jury what the Defendant Mr. Conn's demeanor was, how he was acting? What was his appearance?
>
> "A. [Arresting Officer] He was obviously crying. He was somewhat grief-stricken. He seemed to be fit of mind. There wasn't any situation where he seemed to be suffering from any kind of illness. It seemed to be primarily grief.
>
> "MR. GEDE: [Defendant's Attorney] I object.
>
> "A. He was aware of what was going on when we talked to him.
>
> "MR. GEDE: I object and ask that it be stricken, that he didn't seem to have any illness.
>
> "THE COURT: That he observed. Overruled. Continue."

The only other testimony relating to the appellant's sanity was offered by psychiatrists, qualified as expert witnesses. Two psychiatrists on the staff of Clifton T. Perkins Hospital testified for the State. One said that at the time he examined him, the appellant did not have a "paranoid or explosive personality," had no "symptoms of chronic undifferentiated schizophrenia," was not "psychotic," had no "organic brain

damage," and had "good contact with reality." The other, in response to questions, stated that the appellant was always coherent, did not exhibit either definite psychotic symptoms or reactions, or bizarre or delusional thinking, and did not suffer from any focal disturbance, epilepsy or brain pathology. He offered an opinion upon the ultimate question of the appellant's sanity at the time of the commission of the crime. His opinion was based upon his examination and available background material, including police reports which indicated that shortly after the commission of the crime the appellant showed signs of remorse. In addition he relied upon witnesses' statements and psychiatric, psychological and other non-psychiatric medical reports. He concluded that the appellant "never suffered from a mental disorder." He explained that this was the unanimous opinion of the three psychiatrists on the staff of Clifton T. Perkins Hospital who had participated in the evaluation of the appellant.

One psychiatrist testified for the defense. He stated that at the time of the crime the appellant "was a chronic undifferentiated schizophrenic, and he was psychotic." He concluded by offering his opinion that at the time of the crime the appellant was suffering from a mental disorder or illness and was insane under Maryland law.

The narrow question here presented is whether, in a criminal case in which insanity is asserted as a defense, it is error to admit a lay witness' opinion on the ultimate question of an accused's mental illness or sanity. Although this Court has previously indicated, in dicta, that the opinion of a lay witness on the ultimate question of an accused's sanity is inadmissible, it has never so held.[1]

In Maryland the principles governing the admissibility of opinions offered by lay witnesses on the question of a person's mental condition were first considered in civil cases.[2]

---

1. Gregory v. State, 40 Md. App. 297, 328-29, 391 A. 2d 437, 456 (1978); Bremer v. State, 18 Md. App. 291, 317-18 n. 9, 307 A. 2d 503, 520 n. 9, *cert. denied,* 269 Md. 755 (1973), 415 U. S. 930 (1974).

2. *See, e.g.,* Williams v. Lee, 47 Md. 321, 326 (1877); Waters v. Waters, 35 Md. 531, 541 (1872); Weems v. Weems, 19 Md. 334, 345 (1863); Stewart v. Redditt, 3 Md. 67, 78 (1852); Townshend v. Townshend, 7 Gill 10, 27-28 (1848).

In *Townshend v. Townshend*,[3] a case involving the validity of a will, the Court of Appeals considered the question whether a person other than an attesting witness could offer an opinion that a testator had the mental capacity to execute a will. There the Court said:

"It is stated by the elementary writers upon this subject, that the attesting witnesses are considered in the law as placed round the testator, to protect him against fraud in the execution of his will, and to judge of his capacity; that the testator is intrusted to their care; and it is their duty to inform themselves of his capacity, before they attest his will; and it is on this ground, that these witnesses are permitted to testify as to the opinions they formed of the testator's capacity, at the time of executing his will. And it is equally true, as a general proposition, that the mere naked opinions of other persons, not occupying the position of medical men, are inadmissible in reference to the mental capacity of a testator, whose will may be controverted.

"But the testimony proposed to be submitted by the caveatees, to the jury as illustrative of the mental condition of the testator, was not the mere naked, isolated, unsupported opinion of the witness. The impression made upon the mind of the witness by the conduct, manner, bearing, conversation, appearance, and acts of the testator in various business transactions, for a long series of years, is not mere opinion, it is knowledge, and strictly analogous to the cases of personal identity, and hand-writing, which are constantly established in the law Courts, by the opinion and judgment of persons who have enjoyed the opportunity of observing the person, or hand-writing sought to [be] identified, or proved.

---

3. 7 Gill 10 (1848).

. . .

> "We think, therefore, that the caveatees were entitled to the opinion of this witness, with respect to the capacity of the testator, in connection with the facts upon which it was founded, and that the County Court were wrong in rejecting this testimony." [4]

Thus the Court established that, under appropriate circumstances, the opinion of a lay witness on the question of a person's sanity is admissible in a civil case.

The question whether the same rule was applicable in a criminal case in which sanity was in issue was considered in *Watts v. State.*[5] There an accused murderer asserted that the trial court erred when it refused to admit into evidence lay opinions regarding his sanity. The Court agreed, stating:

> "Ever since the case of *Townshend v. Townshend,* 7 Gill, 10, it has been settled law in this State, in cases where mental sanity is in issue, that a non-expert witness may give his opinion in evidence, in connection with his personal observation of the facts upon which it is founded, and as derived from them. It must appear that the witness had adequate opportunity for forming a rational conclusion, since the mere opinions of witnesses are entitled to little or no regard unless they are founded on facts which warrant them in the opinion of the jury. 'If the reasons are frivolous or inconclusive, the opinions of the witness are worth nothing.' The weight to be given to such an opinion is for the jury, subject of course to the qualification that where the facts stated are such as would not, in the judgment of the Court, enable any rational mind to draw any conclusion therefrom, the opinion proposed to be given may be properly excluded. In *Conn. Ins. Co. v. Lathrop,* 111 U. S. 620, Mr. Justice Harlan said,

---

4. 7 Gill at 27-30.
5. 99 Md. 30, 57 A. 542 (1904).

'Where a cause fairly depends upon the effect or weight of testimony, it is one for the consideration and determination of the jury. * * * It should never be withdrawn from them unless the testimony be of such a conclusive character as to compel the Court, in the exercise of a sound legal discretion, to set aside a verdict returned in opposition to it * * *. The natural and ordinary operations of the human intellect, and the appearance and conduct of insane persons as contrasted with the appearance and conduct of persons of sound mind, are more or less understood and recognized by every one of ordinary intelligence who comes in contact with his species. The extent to [which] such opinions should control or influence the Court or jury, must depend upon the intelligence of the witness as manifested by his examination, and upon his opportunities to ascertain all the circumstances that should properly affect any conclusion reached.' " [6]

Thus the Court established that, under appropriate circumstances, the opinion of a lay witness on the question of a person's sanity is admissible in criminal as well as in civil cases.[7]

Although lay opinions regarding sanity continue to be admissible in civil cases,[8] recent legislative enactments now make it inappropriate to apply the same rule in a criminal case in which an accused has asserted an insanity defense. The first of these enactments involved a change in the test of insanity in a criminal action. When *Watts* was decided the test of insanity, earlier adopted by the Court of Appeals, was whether the offender, at the time of the commission of the offense, could distinguish between right and wrong and

---

**6.** 99 Md. at 36-37, 57 A. at 545.

**7.** *See* Baldwin v. State, 226 Md. 409, 413, 174 A. 2d 57, 59-60 (1961).

**8.** *E.g.,* Sachs v. Little, 245 Md. 343, 351-57, 266 A. 2d 283, 287-93 (1967); Ingalls v. Trustees, 244 Md. 243, 256-59, 223 A. 2d 778, 784-86 (1966); Masius v. Wilson, 213 Md. 259, 269, 131 A. 2d 484, 489 (1957); Cronin v. Kimble, 156 Md. 489, 499-500, 144 A. 698, 702-03 (1929). *See, e.g.,* Dietz v. Moore, 277 Md. 1, 7-8, 351 A. 2d 428, 433 (1976).

understand the nature and consequences of his act.[9] That standard remained the test [10] until the Legislature altered it by the enactment of Annotated Code of Maryland, article 59, section 9 (a) (1968) effective 1 June 1967, which established a test based upon the Model Penal Code section 4.01(1) (1962). Article 59, section 9 (a) provided:

> "A defendant is not responsible for criminal conduct and shall be found insane at the time of the commission of the alleged crime if, at the time of such conduct *as a result of mental disease or defect, he lacks substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of law.* As used in this section, the terms 'mental disease or defect' do not include an abnormality manifested only by repeated criminal or otherwise antisocial conduct." (emphasis added.)

The basic purpose of this enactment was to establish a test of insanity based upon advances made in the science of psychiatry.[11] The legislation broadened the previous "right-wrong" test by making the insanity defense available to an offender who, although he could distinguish between right and wrong and could understand the nature and consequences of his acts at the time of the commission of the crime, could not, as a result of a mental disease or defect, conform his actions to the requirements of the law. Concomitantly, it broadened the scope of admissible psychiatric testimony.[12]

Shortly after article 59, section 9 (a) became effective, this Court for the first time considered the question of who was

---

**9.** Spencer v. State, 69 Md. 28, 37, 13 A. 809, 812-13 (1888).

**10.** *See, e.g.,* Robinson v. State, 249 Md. 200, 225 n. 5, 238 A. 2d 875, 889 n. 5, *cert. denied,* 393 U. S. 928 (1968); League v. State, 1 Md. App. 681, 685, 232 A. 2d 828, 831, *cert. denied,* 247 Md. 740 (1967).

**11.** *See* Model Penal Code § 4.01, Appendix B at 173-74 (Tent. Draft No. 4, 1955). The influence of evolving scientific psychiatric knowledge on the development of a test for insanity is detailed in Durham v. United States, 214 F. 2d 862, 869-75 (1954).

**12.** Explanation of Proposed Amendments to Art. 59, A. A. Marshall, Jr., appearing before Judiciary Committee of the General Assembly (Nov. 21, 1966) (Dept. of Legislative Reference: Legislative Council item number 234, 1966 interim).

competent to offer an opinion on the ultimate issue of an accused's sanity.[13] In *Saul v. State,*[14] the Court decided that the question whether an accused was suffering from a mental disease or defect was a medical question, dependent upon a medical diagnosis. It concluded that an opinion on the ultimate question of sanity, whether an accused was suffering from a mental disease or defect and lacked substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of law, is admissible if offered by a psychiatrist but is not admissible if offered by a psychologist.[15] In reaching this result, the Court relied upon the following resolution adopted in 1954 by the American Medical Association, the Council of the American Psychiatric Association and the Executive Council of the American Psychoanalytical Association:

> " 'The medical profession fully endorses the appropriate utilization of the skills of psychologists, social workers, and other professional personnel in contributing roles in settings directly supervised by physicians. It further recognizes that these professions are entirely independent and autonomous when medical questions are not involved; but when members of these professions *contribute to the diagnosis and treatment of illness,* their professional contributions must be coordinated under medical responsibility.' " [16]

The Court said:

> "The test of the responsibility for criminal conduct under the provisions of Md. Code, Art. 59, § 9 (a) is predicated upon 'mental disease or defect.' We think that the existence of a 'mental disease or defect' is first and foremost a *medical* problem. It is not to

---

**13.** A similar question was raised but not decided in State v. Tull, 240 Md. 49, 53-58, 212 A. 2d 729, 732-33 (1965).

**14.** 6 Md. App. 540, 252 A. 2d 282 (1969), *aff'd on other grounds,* 258 Md. 100, 265 A. 2d 178 (1970).

**15.** 6 Md. App. at 549, 252 A. 2d at 286.

**16.** 6 Md. App. at 549, 252 A. 2d at 286 (emphasis added).

disparage the members of the medical profession who are trained and experienced in the diagnosis and treatment of mental illness to point out that even they frequently differ widely concerning its symptoms, nature, intensity and causal influence with respect to a crime committed or even if it exists as to [a] certain person. It is not yet a matter susceptible of precise determination despite the great advances in medical science. Without question tests by and observations of qualified psychologists are invaluable to the psychiatrist in reaching his opinion as to whether as a result of mental disease or defect an accused is insane and the testimony of such psychologists as to the results of the tests made by him are properly admissible as a means of enlightening the trier of fact, to be considered by it as one of the means by which the psychiatrist reached his opinion as to the sanity or insanity of the accused. But an opinion as to the ultimate fact, whether or not the accused is insane under the test prescribed by § 9 (a), in fairness both to the accused and the State, should be reached by a medical diagnosis. Thus the opinion must be made by a medically trained psychiatrist in order to be admissible in evidence." [17]

In subsequent cases, this Court emphasized the fact that the question of the existence of a mental disease or defect was a medical question by reiterating that an opinion on the question of an accused's sanity is admissible only when offered by a physician and based upon "reasonable medical certainty." [18]

In 1970 and again in 1972, the Legislature, assumably aware of this Court's decisions [19] indicating that only a

17. 6 Md. App. at 549-550, 252 A. 2d at 286-87 (footnote omitted).

18. Millard v. State, 8 Md. App. 419, 426, 261 A. 2d 227, 231, *cert. denied,* 257 Md. 735 (1970); Greenleaf v. State, 7 Md. App. 575, 578, 256 A. 2d 552, 553 (1969), *cert. denied,* 256 Md. 745 (1970).

19. Under the rules of statutory construction the Legislature is assumed to have knowledge of and to act in accordance with the decisions of the appellate courts. Supervisor of Assessments of Anne Arundel County v.

physician could testify on the question of sanity, amended article 59. The amendments substituted the words "mental disorder" for the words "mental disease or defect," [20] and added the following definitions:

> "(f) *'Mental disorder'* means mental illness or any other form of behavioral or emotional illness resulting from any psychiatric or neurological disorder. The term shall not include mental retardation.
>
> "(g) *'Mental illness'* means any mental disorder which so substantially impairs the mental or emotional functioning of an individual as to make it necessary or advisable for the welfare of the person so suffering or for the safety of the persons or property of others that the mentally ill person receive care and treatment. The term shall replace the words 'insane,' 'insanity,' 'lunacy,' 'mentally sick,' 'mental disease,' 'unsound mind' and similar words as they appear in the statutes of the State of Maryland." [21]

The phrase "mental disease or defect," the definition of which had provoked disagreement among psychiatrists, was replaced by the term "mental disorder," a standard which psychiatrists could more readily define and uniformly apply,[22] thereby improving the quality of psychiatric testimony. The term "mental disorder" was defined as a mental, behavioral or emotional *illness* and the words "insane and insanity" were equated with the words *mental illness,* thereby underscoring the medical nature of a determination of sanity. Finally, the term "mental illness" was defined as a disorder which so impairs an individual that it is necessary for him to receive care and treatment in order to protect himself or others,

---

Southgate Harbor, 279 Md. 586, 591-92, 369 A. 2d 1053, 1056 (1977); Herbert v. Gray, 38 Md. 529, 532 (1873); Bush v. Director of Patuxent Inst., 22 Md. App. 353, 359, 324 A. 2d 162, 166, *cert. denied sub nom,* Mazan v. Director, 272 Md. 745 (1974).

**20.** Md. Ann. Code art. 59, § 25 (a) (1972).

**21.** Md. Ann. Code art. 59, § 3 (f), (g) (Cum. Supp. 1978).

**22.** Sherrill v. State, 14 Md. App. 146, 156, 286 A. 2d 528, 533 (1972).

thereby establishing a standard analogous to that used to determine whether a person suffering from a mental disorder may be involuntarily committed.[23] This analogy leads to the conclusion that because involuntary commitment is dependent upon a determination by two physicians that a person has a mental disorder and needs care or treatment for his or others' safety,[24] a finding on the ultimate question of sanity in a criminal action is also dependent upon a similar determination by a physician. Thus, these amendments establish that the Legislature implicitly agreed with this Court's conclusion that the question of sanity is a medical question and that an opinion on the ultimate question of an accused's "mental illness" or its equivalent "sanity" is admissible only if offered by a physician.[25]

Finally, in 1978, the Legislature squarely confronted the question whether only physicians should be permitted to offer opinions on the ultimate issue of an accused's mental illness or sanity. It enacted Annotated Code of Maryland, Courts &

**23.** Md. Ann. Code art. 59, § 12 (a) (1) (Cum. Supp. 1978) provides in pertinent part:

"Any Veterans' Administration hospital or facility licensed by or under the jurisdiction of the Department may admit for the purpose of care or treatment, or both, any person who:

(i) Has a mental disorder; and
(ii) For the protection of himself or others, need[s] inpatient medical care or treatment; and
(iii) Is unable or unwilling to be voluntarily admitted to such facility."

**24.** Md. Ann. Code art. 59, § 12 (c) (Cum. Supp. 1978) provides in pertinent part:

"Each such application for [involuntary] admission to a facility shall:

. . .

(5) Be accompanied by the certificates of two physicians that the prospective patient has a mental disorder, and for his protection or others, needs inpatient care or treatment."

**25.** In 1976, in State v. Williams, 278 Md. 180, 361 A. 2d 122 (1976), the Court of Appeals considered a closely related but distinguishable issue. It recognized that the language of Md. Ann. Code art. 31B (1976), Defective Delinquents, indicated that the Legislature "viewed the question of defective delinquency as primarily a medical problem." It held that an opinion regarding the ultimate issue of defective delinquency is admissible if offered by a psychiatrist but is not admissible if offered by a psychologist. 278 Md. at 187, 361 A. 2d at 126.

Judicial Proceedings article 9, section 120 (Cum. Supp. 1978) effective 1 July 1978, which provides that:

"Notwithstanding the provisions of Article 59 or the provisions of any other law, a psychologist certified under the 'Psychologists' Certification Act' and qualified as an expert witness may testify on ultimate issues, including insanity, competency to stand trial, and matters within the scope of that psychologist's special knowledge, in any case in any court or in any administrative hearing."

Thus, the Legislature opted to broaden the class of persons who could offer an opinion on mental illness or sanity by including, in addition to physicians, another group of specially trained professionals. It did not include lay persons within the class competent to offer such opinions. These circumstances establish that the Legislature intended that only physicians and psychologists and not laymen be permitted to offer opinions on the issue of an accused's mental illness or sanity.[26]

In light of this legislative history, the rule in *Watts* is no longer viable. We now hold that in a criminal case in which an accused asserts an insanity defense, it is error to admit the opinion of a lay witness on the ultimate question of an accused's mental illness or sanity, even if the lay witness may have had adequate opportunity to observe the accused. Accordingly, in this case the trial court erred in admitting the arresting officer's opinion that the accused was not mentally ill.

Here the record shows that the insanity plea was the appellant's principal defense. It further shows that the highly technical and complex testimony of the psychiatrists for the State and the psychiatrist for the defense was in conflict. In closing argument the State itself characterized the arresting officer, who testified on the issue of the accused's sanity, as

---

**26.** Under the rules of statutory construction, the express inclusion of one qualification shows a deliberate rejection of any other. American Security & Trust Co. v. New Amsterdam Casualty Co., 246 Md. 36, 41, 227 A. 2d 214, 217 (1967); Johns v. Hodges, 62 Md. 525, 538 (1884).

an "important lay witness" whose testimony should be relied upon to determine that the accused was sane at the time of the commission of the offense. Of all the witnesses who testified on the question of the accused's sanity, the arresting officer was the only one who had the opportunity to observe the accused shortly after the crime was committed. His opinion that the appellant "seemed to be fit of mind" and did not seem "to be suffering from any kind of [mental] illness" was stated in clear and simple terms, which could be readily understood by the jury. His opinion may have contributed to the jury's determination to credit the testimony of the State psychiatrists and, therefore, to the guilty verdict. Upon our independent review of the record, we are not persuaded beyond a reasonable doubt that under the present circumstances the error was harmless.[27] Accordingly, we shall reverse.

> *Judgment reversed.*
> *Case remanded for a new trial.*
> *Costs to be paid by Baltimore County.*

27. Beahm v. Shortall, 279 Md. 321, 331-32, 368 A. 2d 1005, 1011 (1977); Dorsey v. State, 276 Md. 638, 657-59, 350 A. 2d 665, 677-78 (1976); Ross v. State, 276 Md. 664, 673-74, 350 A. 2d 680, 686-87 (1976); Brown v. State, 39 Md. App. 497, 514, 388 A. 2d 130, 140 (1978); Facyson v. State, 35 Md. App. 202, 206-08, 370 A. 2d 158, 161-62 (1977).