JACK R. GROVER *v.* STATE OF MARYLAND

[No. 784, September Term, 1978.]

*Decided March 12, 1979.*

The cause was submitted on briefs to THOMPSON, WILNER and COUCH, JJ.

Submitted by *Alan H. Murrell, Public Defender,* and *Thomas J. Saunders, Assistant Public Defender,* for appellant.

Submitted by *Francis Bill Burch, Attorney General,*

*Stephen Rosenbaum, Assistant Attorney General, Sandra A. O'Connor, State's Attorney for Baltimore County,* and *Mark A. Vanbavel, Assistant State's Attorney for Baltimore County,* for appellee.

THOMPSON, J., delivered the opinion of the Court.

Jack R. Grover, the appellant, was convicted by a jury in the Circuit Court for Baltimore County (Buchanan, J.), of felony murder and committed to the custody of the Division of Correction for the remainder of his natural life. On appeal he contends:

1. His trial counsel was ineffective because he failed to request an instruction regarding the law of voluntary intoxication.
2. The court erred in admitting the appellant's statement into evidence.
3. The court erred by permitting the State to introduce the autopsy protocol without requiring the presence in court of a certain doctor who prepared a portion of the report.
4. The court erred in admitting certain photographs into evidence.

William Markwitz, a security guard for Baltimore City, was assigned to work at the Baltimore City Courthouse for the 3 P.M. to 11 P.M. shift on December 23, 1977. Between 7:30 and 8:00 P.M. that evening, a patient at Perry Point Hospital and an acquaintance of Markwitz, Vernon Stevens, stopped by to see Markwitz. Both Markwitz and Stevens consumed an unspecified quantity of alcoholic beverages at a Christmas party which was in progress at the courthouse. At 11 o'clock Stevens left with Markwitz in Markwitz's car. They first drove to the old Post Office Building and picked up the appellant. They then continued on to the Perry Point Hospital.

Thomas Bowman, a nursing assistant at the Perry Point Hospital testified that Stevens arrived at the hospital at 12:30 A.M. December 24 and asked for a refill of his medicine. Bowman stated that Stevens explained that he had been robbed of his medicine while riding on the bus to Baltimore

but that the robbers had not taken his money. After the refill was refused, Stevens left.

The appellant's statement was introduced by the State. In it he admitted going with Markwitz and Stevens to Perry Point. On the way, he said that they had stopped at an isolated location and had gotten out of the car to urinate. Getting back in, the appellant said Stevens had closed the door on his fingers. In retaliation he said he had punched Stevens. Some time later, they again got out of the car and he hit Stevens a second time. The appellant said he got back in the car while Markwitz and Stevens remained outside the car. A few minutes later, Markwitz got back in and gave him $80 or $90. They then drove away leaving Stevens behind.

Around 4:00 P.M. December 24, 1977, Stevens' body was found in a swamp about twenty feet off the road. No wallet or paper money was found on the body. Dr. Hormez Guard performed an autopsy and concluded that death had resulted from "multiple blunt force injuries to the head."

Mary Mumford, a neighbor of Markwitz said she had talked to Markwitz and the appellant on December 26, 1977. They told her they had killed a man and asked her for a cleaning solution to remove blood from Markwitz's car. Around 10:30 A.M. on March 1, 1978, the police arrested the appellant in an apartment in Baltimore City for the homicide and transported him to the Baltimore County Police Headquarters.[1]

## I Competency of Counsel

Throughout the trial, testimony was presented that Markwitz, Stevens and the appellant had consumed alcoholic beverages during the evening of the homicide. No specific quantities of consumption were mentioned and there was no direct testimony as to the degree of impairment the drinking had caused. No instructions to the jury regarding the law of voluntary intoxication were requested by the appellant's trial counsel, no objections to the court's failure to so instruct were

---

1. Markwitz was tried separately, convicted of first degree murder and committed to life imprisonment.

noted and the appellant did not argue any intoxication defense to the jury.

On appeal the appellant notes he was convicted of felony murder and that the underlying felony was robbery. Then, relying on *State v. Gover,* 267 Md. 602, 298 A. 2d 378 (1973), he argues that if the jury had been instructed that intoxication could negate the crime of robbery, they might have found him not guilty of the underlying felony of robbery and accordingly would have also acquitted him of the felony murder. As his attorney did not raise the issue, he asserts that his trial counsel was ineffective. The issue of competency of counsel was not raised or considered below and we will not consider it for the first time on appeal. *Wilson v. State,* 261 Md. 551, 276 A. 2d 214 (1971).

## II Admission of Appellant's Statement

Prior to the admission of the appellant's statement into evidence, a suppression hearing was conducted to determine whether the statement had been voluntarily made. The appellant's arrest occurred between 10:30 and 11:00 A.M. He was turned over to Detective Wysham at 1:00 P.M. Wysham testified that he read *Miranda* rights to the appellant and that at 1:10 P.M. the appellant initialed a card indicating he had received his *Miranda* rights. At the same time the appellant told Wysham that he was willing to give a statement.

At the hearing the appellant attacked the voluntariness of his statement. First, he claimed that he could not read the waiver because he didn't have his glasses. Second, he claimed that he had been out drinking the night before, was "hung over" and had an "upset stomach" at the time the statement was given. In *Dempsey v. State,* 277 Md. 134, 151, 355 A. 2d 455 (1976), the Court of Appeals said:

> "In *Bryant* [*v. State,* 229 Md. 531 (1962)], and *Mundell* [*v. State,* 244 Md. 91 (1966)], the Court set forth the general principle that evidence of mental impairment from drugs or alcohol does not per se render a confession involuntary, and that a court

may admit a confession into evidence if it concludes that it was freely and voluntarily made . . . ."

At the conclusion of the suppression hearing, in the instant case, the court said:

"I find that the *Miranda* safeguards were adequately given. And I also find, considering the totality of the evidence, that the State has met the burden by a preponderance of the evidence that his confession in fact was voluntary. Therefore I am going to overrule your motion as to the admissibility, since I think under the circumstances the statement is in fact admissible."

Based on our independent review of the record, we concur with the court that the State met its burden of proving the voluntariness of the appellant's waiver and find the appellant's contention concerning voluntariness to be without merit.

## III Autopsy Report

As his third contention, the appellant complains that the court erred in permitting the State to introduce the autopsy report because it contained a statement by Dr. Biagio Azzarelli who did not testify.

Dr. Hormez Guard, who was called by the State, explained that he was a medical examiner for the State; that his job was to investigate "all cases of sudden unnatural deaths and deaths resulting from violence and other problems"; that he was qualified for this work because he was a forensic pathologist; that he had performed an autopsy on Stevens; and that it was his conclusion that Stevens had "died from multiple blunt force injuries to the head." Dr. Guard also testified that while he was qualified to study brain injuries, the medical examiner's office did employ a neuropathologist, Dr. Biagio Azzarelli, to whom he generally referred brain injury matters. After eliciting from Dr. Guard that the autopsy report had been prepared in the ordinary course of his business as a medical examiner, the report was admitted.

The appellant objected to the admission of the report because it contained a statement by Dr. Azzarelli.

The appellant, relying on *Gregory v. State,* 40 Md. App. 297, 391 A. 2d 437 (1978), contends that his Sixth Amendment right of confrontation was violated by the introduction of a document prepared in whole or in part by a party not present in court to testify. In *Gregory v. State, supra,* at 40 Md. App. 326 we said:

> "We have here not the routine record of a person's birth, or death, or body temperature, nor any other similar statement of fact or condition objectively ascertained, generally reliable and normally undisputed, and free from any motive to record falsely. We are dealing with the opinions of supposed expert witnesses, who, in this document, are giving testimony not only as to appellant's mental condition, but, more importantly, as to whether or not he is criminally responsible. The document was offered without limitation as to purpose, and therefore for its truth. Thus, the jury was not merely advised of the fact that three staff psychiatrists had formed certain opinions; it was asked to accept as true — i.e., to believe — the opinion of these three physicians that appellant was 'sane' at the time he entered the bank."

In *Gregory v. State, supra,* we noted that the field of forensic psychiatry was an inexact science and that differences of opinion frequently existed between experts in the field. This being so, we concluded that the opportunity to cross-examine a witness giving such opinion evidence could be of crucial importance. It should not be supposed that *Gregory* stands for the proposition that the confrontation clause of the constitution precludes the admission of all evidence under exceptions to the hearsay rule. Dr. Azzarelli's statement in the autopsy report did not express any opinion. It merely stated his findings of the physical condition of the

decedent's brain.[2] As such it falls under the category of a "fact or condition objectively ascertained," and was probably admissible as a business record as provided by the *Md. Code,* Courts and Judicial Proceedings Article, Section 10-101. It was clearly admissible under *Md. Code,* Article 22, § 8 which has been construed by *Benjamin v. Woodring,* 268 Md. 593, 608, 303 A. 2d 779 (1973) to make autopsy reports admissible as to facts, but not as to opinions.

## IV Admission of Photographs

The State presented two photographs of the victim taken at the scene where the body was recovered. The photographs were offered into evidence but, in response to the appellant's objection, were not admitted at that time. At the close of the State's case, the State again moved that the photographs be admitted and they were admitted without objection. The appellant now claims these photographs should not have been admitted because they were inflammatory. No objection was raised at the time they were admitted, thus the issue has not been preserved for appeal. Md. Rule 1085.

*Judgment affirmed.*
*Appellant to pay the costs.*

---

2. Dr. Azzarelli's complete report reads as follows:
"Brain Note
"WEIGHT: 1710 grams
"The dura mater and dural sinuses are not remarkable. The leptomeninges are thin and transparent. There is extensive accumulation of fresh subarachnoid hemorrhage involving the entire brain. The brain is symmetrical. The convolutions are moderately flattened with narrowing of the sulci. The ventricular system is of normal size and symmetrical. There is minimal accumulation of recent blood clots on the posterior horns of both lateral ventricles. The third ventricle is of normal size and symmetrical. There is bilateral uncal notching, but no true herniations. The tonsils are normal. On multiple coronal sections, there are recent contusion hemorrhages involving the anterior third of both gyri recti. Also, recent contusion hemorrhages are observed on the left superior parietal lobe, on the entire length of the occipital temporal convolution, on the inferior surface of the left occipital lobe, and also involving the calcarine cortex of the right occipital lobe. The white matter, basal ganglia, thalami, optic nerves and tracts are not remarkable. The midbrain, pons, cerebellum, and medulla oblongata are normal. The arteries of the Circle of Willis show no vascular malformations or arteriosclerosis. No non-traumatic lesions are observed through the entire brain.
Biagio Azzarelli, M.D."