## DAVID ALBERT PFEIFFER *v.* STATE OF MARYLAND

[No. 119, September Term, 1979.]

*Decided November 7, 1979.*

The cause was argued before THOMPSON, MOYLAN and MacDANIEL, JJ.

*George E. Burns, Jr., Assistant Public Defender,* with whom was *Alan H. Murrell, Public Defender,* on the brief, for appellant.

*Diane G. Goldsmith, Assistant Attorney General,* with whom were *Stephen H. Sachs, Attorney General,* and *Warren*

B. Duckett, Jr., State's Attorney for Anne Arundel County, on the brief, for appellee.

THOMPSON, J., delivered the opinion of the Court.

On the evening of December 12, 1977, shortly after 11:00 p.m. Trooper Greg Presbury of the Maryland State Police stopped David Albert Pfeiffer, the appellant, on Maryland Route 3 in Anne Arundel County. Presbury was shot and later died from his wounds and appellant was also shot. Julianna Snyder and Rita Jones, communications officers with the Maryland State Police, received a transmission from Trooper Presbury on December 12, 1977, at approximately 11:20 p.m. After doing a license check on the name supplied by Trooper Presbury, "Yancey Wesley Vine," Ms. Snyder discovered that there was no record of ·a driver's license for that name. According to Ms. Jones, when Trooper Presbury supplied the tag number for the vehicle, her check indicated that the tags were registered to an "Anna May Jones" on Falls Road in Cockeysville, who coincidentally was her aunt. When she advised Trooper Presbury that she knew the subject and that the tags were registered to a '73 Gremlin which had been traded, Trooper Presbury informed her that the tags were on a '65 or '66 Chevrolet. The Trooper requested a back-up, stating that "something looked weird." In a few minutes an unknown citizen came on the radio and his only words were, "Send help, your trooper's been hurt."

James Lane was driving on Route 3 when he heard shots and saw a police car on the side of the road behind another car. Lane stated that he heard "four or five rapid fire shots" and saw "somebody started running from the back part of the car that had the flashing blue light on it; and he fell just like somebody hit him from behind with something. I assumed it was a bullet; and he went down on the ground; and he faded right into the ground." Lane stated that he was unable to identify the man who did the shooting but the man was somewhere between the police car and the guardrail. Lane saw the man depart in a dirty blue or dark green Chevrolet at a high rate of speed with the lights out. Another passerby, Gene Fogle, saw the trooper lying on the ground behind the

police car and observed another individual running to get to his car parked in front of the police car. Fogle testified that the individual took off in a fast manner. Fogle then went to the police car and radioed for help. Another witness, Joseph Malone, Jr., who lived approximately fifty yards from Route 3, testified that on December 12, 1977, he saw a police car and a dark car on Route 3 and noticed someone raise the hood of the dark car. Presbury's body was found to be forty-two feet from the rear of the police car. Six .45 caliber shell casings and one bullet were recovered at the scene of the crime.

A dark green car was discovered without license plates the day after the shooting near the Edison Electric Company which was owned by John Raap, appellant's former employer. The car contained blood on the driver's side. John Raap testified that he was with appellant during the early evening prior to the shooting and that appellant seemed stable at that time. Later that evening appellant returned wounded and armed, seeking help and threatening Raap. Raap said appellant "was hysterical or out of his mind." Raap then accompanied appellant in search of John Hayslip. After finding Hayslip, appellant let Raap go. Hayslip said that he attempted to console appellant, and tended to his wounds. Appellant repeatedly told Hayslip that he had shot a police officer.

Thomas Mathias, a co-worker of appellant's, said that during the month they had worked together appellant had confided that he disliked driving his car because it had stolen tags and "if he ever got pulled over by an officer that he would have to shoot it out with him because he was in violation of parole and he didn't want to go back to prison."

Appellant testified stating that he was armed because his life had been threatened by former inmates at the Maryland Penitentiary. He offered the following testimony as to what ensued between him and Presbury:

> "I — got the car and he asked me for some ID so
> I give him these two cards. You stipulated and uh,
> I gave him these two cards and I said officer, listen,
> I have no — I don't have no driver's license. I says
> I just got out of the joint, that's what I said, not, you

know, not too educated and I just kind of stutter and I said well, I mean I just got out of the Penitentiary. I didn't want to be disrespectful to him.

* * *

"So I approached him and he asked me . . . he said something again. I don't know what he said . . . I says officer, what'd you say? I — looks like somebody gettin' — maybe he thought I was indignant or somethin', you know, making — funny kind of motions and all, I approached him, I says what'd you say officer — and heavy traffic was — heavy traffic was coming by and I guess he couldn't hear me. Too good. Oh well, at that point he put his, one of his hands real fast down by his side like going for his service revolver . . . I said man, I said what's this. So I got scared, took a couple steps back, then first thing I know I seen a flash and heard a bang, you know what I mean. Like a — I went down and I was scared and confused at that time. I don't know what was going on. So trying to — on my hands and knees trying to crawl away and I hear another bang. I think that time I got hit in the hip, the buttock, I'm not sure but it felt like it there.

Q. You were armed at this time?

A. Yes I was armed but I didn't display no weapon.

Q. What were you armed with?

A. A 45 automatic."

Testimony was presented as to appellant's mental capacity by Raap and Hayslip. Both stated that appellant had violent shifts of mood. Medical records were also introduced showing appellant, 40 years of age at the time of the trial, was placed in mental institutions twice when a teenager. The records and reports from the Clifton T. Perkins Hospital, where he had been examined to determine his capacity to stand trial and his sanity at the time of the crime, were also introduced into evidence. All of the reports were admitted subject to exception as was the testimony of two experts, who had examined the appellant at Perkins. Both experts had found

appellant sane at the time of the crime and able to stand trial.[1] A summary of their other testimony follows.

Edmond Rozecki, a psychologist,[2] diagnosed appellant as being sociopathic, with strong antisocial tendencies. He testified that:

"[T]his individual shows poor judgment and failure to learn from experience. He has antisocial behavior without apparent compunction, in other words his behavior is almost feelingless. He possesses a specific loss of insight. He is not capable of looking into the meaning of his behavior, from a viewpoint such as most normal people demonstrate. He mimics human personality, but really is unable to feel — he doesn't have the feeling. He definitely is emotionally immature. I mentioned before he — his — he uses poor judgment and as you study some of the previous history that goes back, not to 1957 but 56 and even further, this type of poor judgments and immaturity existed then.

"His behavior is guided by impulse and current needs. When he does something, he's doing it N-O-W, NOW. He's not thinking, what does it mean five minutes from now or the next day. His whole attitude and thinking is along these lines.

"He's definitely a very aggressive personality. Person. The future if it exists for him is in a very vague and faint way and as a result he has to gratify his needs now. He treats other people as objects, instead of persons — as a person, and he has no feeling of guilt about it. It's a — he acts on impulse as I mentioned and without forethought. And he achieves his own satisfactions without concern for the effects his actions will have on others.

"This describes — he's also a person, I mentioned, he doesn't learn from experience. The more you punish him the punishment is not gonna make him

---

1. The plea of not guilty by reason of insanity was withdrawn before trial.
2. *See:* Md. Code, Courts & Judicial Proceedings Art. § 9-120.

better. You give him punishment, it just confirms in his mind how horrible the world is on the outside. He's a — definitely that type of person and that's when I use the term sociopathic, I'm talking of that kind of a person.

"This kind of a person for instance, when he is involved in a crime, the crimes are senseless. They make no sense."

Dr. Michael Spodak, a psychiatrist, testified:

"Q. Well with respect to the capacity of Mr. Pfeiffer to control himself on a day-to-day environment, I wonder if you would explain to His Honor with respect to his personality profile, how that profile might affect his capacity to make judgment, insight, control himself, and to react to threatening situations?

"A. Well first to say that the diagnosis that we made was consistent with diagnoses made from hospital reports we reviewed dating back perhaps twenty years or more, including Taylor Manor and some of the state hospitals. And the reason I mention that is because, again the suggestion that this has gone on for essentially all his life and reviewing some of their reports which describe him as being rebellious, hostile, aggressive and so on, suggests that there are many times in his life when he is unable to control those aggressive feelings; they get him in trouble not only with the law, but also in terms of being committed, two physician commitments to State hospitals and so on. And that he goes through life some of the time being able to control himself, and some of the time he kind of erupts."

Dr. Spodak also testified as to how appellant would act in a fast moving traumatic situation where he feels threatened. He stated:

"I think that there are times that he might overreact and there are times that he might not and

some of that would depend on the specifics of the situation. I think that as a general thing because of these personality features he would be more likely to overreact than someone without those personality features." [3]

Judge E. Mackall Childs, sitting without a jury in the Circuit Court for Anne Arundel County, found the appellant guilty of murder in the first degree and imposed a life sentence. His findings as to intent were:

"Now there are cases that have been held that if the slightest interval of time elapses so that the accused can form an intent or make a decision either to act or not to act, that constitutes sufficient intent to constitute murder in the first degree. The Court does not have to speculate as to that intent however because we have the testimony of Mr. Thomas Mathias who as early as one month prior to this unfortunate event on the 12th of December, heard the defendant say that if he were ever to be stopped by a patrolman in this particular car he would have to shoot it out with him.

"So that intent is not necessarily directed toward Trooper Presbury, but any Trooper; was fully formed, at least within the period of one month prior to December 12th of 1977. It was not only formed, it was expressed. And it happened just as Mr. Pfeiffer said it would happen, that he would shoot it out, with the policeman because he knew and defense counsel concedes that regardless of what Mr. Pfeiffer thought the officer would do, the officer had a right to make an arrest at that particular point, and it is extremely unlikely that any officer under these circumstances would issue a warning ticket.

"Other witnesses such as Mr. Hayslip and Mr. Raap testified that immediately after he came into their presence he was at that time attempting to

---

3. The State did not follow up its objections to the admission of the medical reports and the testimony of the two experts with a motion to strike.

fabricate a story and as I recall the testimony, even Mr. Hayslip who himself was probably the closest thing to a friend that Mr. Pfeiffer had, prior to this period, told him that he wanted nothing to do with the fabrication; he further testified that Mr. Pfeiffer had said that the reason he shot the policeman was that he was picked up dirty, which the Court understands to mean that when he was picked up he was then subject to arrest for various items and he knew it and he was going to avoid being returned to prison, even if it meant grievously wounding or killing whoever attempted to do it."

At the conclusion of the opinion defense counsel inquired as to whether or not the trial judge had refused to consider the testimony of the two experts and the medical records. The judge responded that counsel's surmise was correct and that this evidence had been stricken. During the course of his opinion he had stated his view that mental evidence could not be considered in determining intent. The next day the trial judge wrote a memorandum to clarify his rulings saying in part:

"Although the court reviewed the medical records offered by the defense, it did not consider them in arriving at its conclusion as to intent in view of the testimony of the witnesses, Thomas Mathias, John Raap and John Hayslip who had the opportunity of talking to the defendant immediately before the crime (Mathias and Raap) and immediately after (Raap and Hayslip). The court considered their direct observations far superior to the theoretical opinion evidence offered by the reports and the expert witnesses. Consequently, the medical records were stricken and the professional testimony disregarded, *Spears v. State,* 38 Md. App. 700, on the premise that the doctrine of diminished intention plays no part in Maryland Law. *Armstead v. State,* 227 Md. 73, 22 ALR 3rd 1229, [175 A.2d 24 (1961)]; and that Pfeiffer's dispassionate plan which he expressed to

Mathias to "shoot it out" with any policeman who stopped him while driving his car was carried out, as planned, in a calculated and cold-blooded manner."

## I Medical Evidence

Appellant contends the trial judge was in error in striking the medical evidence. Assuming, without deciding, there was error we have no difficulty in finding beyond any reasonable doubt the error did not contribute to the verdict. *Dorsey v. State*, 276 Md. 638, 350 A.2d 665 (1976). The judge stated he considered the testimony of the witnesses who talked to the appellant before and after the crime more important in determining intent than the theoretical medical evidence. Not only are we unable to say this finding was clearly erroneous, we entirely agree with it and have no doubt whatsoever the appellant was capable of and did in fact, wilfully deliberate and premeditate the killing, as required to support a verdict of murder in the first degree. *Armstead v. State, supra.*[4]

---

4. When Armstead v. State, *supra,* was decided, very few courts recognized the doctrine of diminished responsibility. Our research discloses that now a majority of jurisdictions admit psychiatric opinions as evidence that the defendant did not have the required specific intent, especially in first degree murder cases. Some cases have even held that the refusal to admit such evidence constituted a denial of due process. It may well be that the present Court would arrive at a different conclusion today. *See:* United States v. Erskine, 588 F.2d 721 (9th Cir. 1978); Hughes v. Mathews, 576 F.2d 1250 (7th Cir.), *cert. dismissed,* 99 S.Ct. 43 (1978); United States v. Brawner, 471 F.2d 969 (D.C. Cir. 1972); Rhodes v. United States, 282 F.2d 59 (4th Cir.), *cert. denied,* 364 U.S. 912 (1960); Johnson v. State, 511 P.2d 118 (Alas. 1973); People v. Wetmore, 22 Cal.3d. 318, 583 P.2d 1308, 149 Cal. Rptr. 265 (1978); Becksted v. People, 133 Colo. 72, 292 P.2d 189 (1956); State v. Donahue, 141 Conn. 656, 109 A.2d 364, *appeal dismissed,* 349 U.S. 926, 99 L.Ed. 1257, 75 S.Ct. 775 (1954); State v. Moeller, 50 Haw. 110, 433 P.2d 136 (1967); State v. Clokey, 83 Idaho 322, 364 P.2d 159 (1961); State v. Gramenz, 256 Iowa 134, 126 N.W.2d 285 (1964); Koester v. Commonwealth, 449 S.W.2d 213 (Ky. 1969); People v. Fields, 64 Mich. App. 166, 235 N.W.2d 95 (1975); State v. Anderson, 515 S.W.2d 534 (Mo. 1974) (by statute); State v. McKenzie, Mont., 581 P.2d 1205 (1978) (by statute); Starkweather v. State, 167 Neb. 477, 93 N.W.2d 619 (1958); State v. Sikora, 44 N.J. 453, 210 A.2d 193 (1965); State v. Padilla, 66 N.M. 289, 347 P.2d 312 (1959); People v. Colavecchio, 11 App. Div.2d 161, 202 N.Y.S.2d 119 (4th Dept. 1960); State v. Nichols, 3 Ohio App.2d 182, 209 N.E.2d 750 (1965); State v. Booth, 284 Ore. 615, 588 P.2d 614 (1978) (by statute); Commonwealth v. Walzack, 486 Pa. 210, 360 A.2d 914 (1976); State v. Fenik, 45 R.I. 309, 121 A. 218 (1923); State v. Green, 78 Utah 580, 6 P.2d 177 (1931); State v. Ferrick, 81 Wash.2d 942, 506 P.2d 860, *cert. denied,* 414 U.S. 1094 (1973); Schimmel v. State, 84 Wis.2d 287, 267 N.W.2d 271 (1978).

The following jurisdictions have refused to recognize the doctrine of diminished responsibility: State v. Janovic, 101 Ariz. 203, 417 P.2d 527, *cert. denied,* 385 U.S. 1036 (1966); Bethea v. United States, 365 A.2d 64 (D.C. 1976), *cert. denied,* 433 U.S. 911 (1977); Bates v. State, Del., 386 A.2d 1139 (1978); Bradshaw v. Florida, 353 So.2d 188 (Fla. App. 1977); State v. Rideau, 249 La. 1111, 193 So.2d 264 (1966), *cert. denied,* 389 U.S. 861 (1967); State v. Park, 159 Me. 328, 193 A.2d 1 (1963); Commonwealth v. Mazza, 366 Mass.

## II Sufficiency of the Evidence

Appellant argues the evidence was insufficient to support the verdict because he testified to facts which would support a finding that he shot only in self-defense. There was no obligation for the trial judge, as the trier of the facts, to accept this testimony. *Rasnick v. State,* 7 Md. App. 564, 256 A.2d 543 (1969), *cert. denied,* 257 Md. 735 (1970), *cert. denied,* 400 U.S. 835, 91 S.Ct. 70 (1970). He argues further that the facts found by the trial judge as to his intent were improbable, but as we stated above, they do not appear improbable to us.

*Judgment affirmed.*
*Appellant to pay the costs.*

## ACTION ON RECONSIDERATION

David Albert Pfeiffer moves that we reconsider our affirmation of the judgment in this case in view of *Brown v. State,* 44 Md. App. 71 (1979). We grant the motion and strike out the order for the mandate in our original opinion and insert in lieu thereof the following:

## III Motion for Reconsideration

In *Brown v. State,* 44 Md. App. 71 (1979), this Court held the failure to allege malice in an indictment for murder constituted reversible error because malice is an essential element of the crime. In the instant case the indictment, except for names and dates, was identical with that discussed in *Brown, supra,* thus, consistency requires that we make a similar decision in this case. Inasmuch as the failure to allege a crime is jurisdictional, the question may be raised at any time even though it was neither raised below nor in the

30, 313 N.E.2d 875 (1974); Painter v. Commonwealth, 210 Va. 360, 171 S.E.2d 166 (1969); State v. Flint, 142 W.Va. 509, 96 S.E.2d 677, *cert. denied,* 356 U.S. 903 (1957).

In the following jurisdictions the situation is unclear: Woods v. State, 214 Ga. 546, 105 S.E.2d 896 (1958); Grimaldi v. State, 90 Nev. 83, 518 P.2d 615 (1974); Fox v. State, 73 Nev. 241, 316 P.2d 924 (1957); State v. Hammonds, 290 N.C. 1, 224 S.E.2d 595 (1976) and State v. Cooper, 286 N.C. 549, 213 S.E.2d 305 (1975).

*See also,* Arenella, *The Diminished Capacity and Diminished Responsibility Defenses: Two Children of a Doomed Marriage,* 77 Colum. L.Rev. 827 (1977); Lewin, *Psychiatric Evidence in Criminal Cases for Purposes Other Than the Defense of Insanity,* 26 Syracuse L.Rev. 1051 (1975); *Diminished Capacity — Recent Decisions and an Analytical Approach,* 30 Vand.L.Rev. 213 (1977); Model Penal Code 4.02(1) (proposed Official Draft 1962).

appellant's brief. *Andresen v. State,* 24 Md. App. 128, 153, 331 A.2d 78, *cert. denied,* 274 Md. 725 (1975), *aff'd.* 427 U.S. 463, 96 S. Ct. 2737, 49 L. Ed. 2d 627 (1976).

*Judgment reversed.*
*Pursuant to Maryland Rule 1082 f,*
*costs are not reallocated.*