# JOHN SWAIN *v.* STATE OF MARYLAND

[No. 94, September Term, 1981.]

*Decided October 9, 1981.*

The cause was argued before LOWE, COUCH and WEANT, JJ.

*John L. Kopolow, Assistant Public Defender,* with whom was *Alan H. Murrell, Public Defender,* on the brief, for appellant.

*Philip M. Andrews, Assistant Attorney General,* with whom were *Stephen H. Sachs, Attorney General, Andrew L. Sonner, State's Attorney for Montgomery County,* and *Barry Hamilton, Assistant State's Attorney for Montgomery County,* on the brief, for appellee.

COUCH, J., delivered the opinion of the Court.

John Swain was charged by indictment filed November 16, 1979, with premeditated murder and use of a handgun in the commission of a felony. He pleaded not guilty and not guilty by reason of insanity, and elected a jury trial. The trial commenced on July 28, 1980 in the Circuit Court for Montgomery County.

On August 6, 1980, the jury found Mr. Swain to have been sane at the time of the offense, and to be guilty of murder in

the first degree and use of a handgun in the commission of a felony. He was sentenced to consecutive terms of life imprisonment for murder and five years imprisonment for the handgun offense.

On appeal, Mr. Swain, the appellant, presents the following questions:

1. Did the hearing court err in refusing to suppress evidence obtained from appellant as a result of his arrest, which was effected in violation of the District of Columbia Fresh Pursuit Statute?

2. Did the hearing court err in holding that appellant's merely telling one police officer that he understood the *Miranda* rights previously given by another officer constituted an effective waiver of those rights?

3. Did the trial court err in permitting the State to use a medical treatise in the direct examination of its psychiatric expert?

4. Did the trial court err in allowing the State's psychiatric expert to give opinion testimony that was based in part upon conclusions drawn by an uncertified psychologist?

5. Did the trial court erroneously instruct the jury on the element of malice?

For the reasons set forth in this opinion we hold that the lower court did not err in its actions and rulings, and we affirm the lower court's judgment.

### The Facts

At approximately 5:30 to 5:45 in the morning of October 25, 1979, Anne Delores Logan was shot five times at close range while she drove on Connecticut Avenue in Chevy Chase, Maryland, a short distance from the Maryland-District of Columbia border. Her 1978 Thunderbird veered off the road and crashed into a tree

located in an adjacent park. She died before she could be moved to a hospital.

At this same time, Alec Armbrister prepared to begin his paper route. He was walking along Newlands Street between Connecticut Avenue and Brookville Road when he heard noises sounding like a car backfiring five or six times. He then saw Ms. Logan's car traveling north on Connecticut Avenue, and watched the car as it crashed off the road. Mr. Armbrister entered the small park by jumping over a fence, and he saw a man approach him from the wrecked car.

To Mr. Armbrister's question, "What should I do?", the man replied, "Go and see if the lady was all right." The man also indicated that he would call an ambulance, and then he ran out of the park. Although the morning was still dark, Mr. Armbrister saw that the man in the park was a black male, about six feet tall, not muscular, 165-170 pounds, in his early to mid-thirties, with a low bush-style haircut, and wearing all black clothes, including a black jacket.

Going to the car, Mr. Armbrister saw its occupant, a black woman, slumped over. Immediately thereafter police officers arrived, and requested that the witness write notes concerning what he had seen. He was also informed that the woman he had seen had been shot.

During this time, a second paper boy, Giles Sommerville, was walking along Brookville Road when he heard sirens coming from the direction of Connecticut Avenue. As he reached the intersection with Quincy Street, a man entered the intersection from Quincy. This man nodded as he walked by, responding to Mr. Sommerville's salutation, and then turned north on Brookville Street. Mr. Sommerville described him as a black man, age 25-30 years old, about five eleven to six feet tall, skinny, with close-cut hair, sideburns, and wearing a dark vest, and dark blue trousers.

The initial report of Ms. Logan's car crash reached the Montgomery County Emergency Operations Center (EOC) at 5:39 A.M. The crash was reported as an accident by a

member of the Herndon React.[1] Police officers arrived at the scene by 5:42 A.M., according to EOC records, and quickly reported that a black man had been in the car with Ms. Logan, and had been seen running eastbound, down Melrose from Connecticut.

Following notification by medical personnel at the crash site that Ms. Logan had suffered multiple gunshot injuries, at approximately 5:54 a police officer requested that the radio dispatcher, "Call the Bethesda Station and have an officer on this shift get everyone out of the station they can spare and have them converge on the area down here."

By 6:03 A.M. the police were informed by radio that they had "official permission to work two or three blocks into D.C." The officers were also told that Ms. Logan had died, and that her death appeared to be by homicide (Code O-100). As officers questioned Mr. Armbrister and Mr. Sommerville, descriptions of the homicide suspect were broadcast. The initial description, provided at 6:10 A.M., described a black male, over six foot, wearing dark clothes, and possibly wearing a hat. A subsequent broadcast, based on Mr. Sommerville's questioning, indicated that the suspect was:

> "A Negro male, skinny, 5'11"-6'0", black pants, solid black vest-type jacket, there's a white line in it, and last seen on Brookville, and he's going to be northbound."

Having heard the initial description of the suspect, police officers detained a black male who was walking across Western Avenue, and who was wearing a green Army jacket. The officers reported that they did not believe that he was their suspect, but they did not release him until Mr. Armbrister saw him and confirmed their belief. The Montgomery County Police then continued in their efforts to find the homicide suspect.

One of the participating police officers was Officer Linda Krieger, a four-year veteran assigned to the Bethesda

---

. 1. React is an organization of private citizens who monitor the citizens' band radio emergency channel, and report traffic accidents to the police.

station. Officer Krieger had worked the 10:00 P.M. to 6:00 A.M. shift on a stake-out detail in the Friendship Heights business district, which is near the crime scene. She worked alone, in plain clothes, and drove an unmarked van equipped with a police radio. As she prepared to go off duty she heard the first radio communications regarding the wrecked automobile on Connecticut Avenue. Being aware of only a reported personal injury accident, Officer Krieger continued to unload her van at the Bethesda station, while she monitored the police broadcasts.

Following the subsequent reports of Ms. Logan's shooting, that a black male was seen running from the car and that the incident was designated as an "O-100, which is a murder," Officer Krieger drove her police van into the District of Columbia.

As she drove, Officer Krieger continued to receive information regarding the murder suspect from the investigating officers who had questioned the eyewitnesses. She arrived at the site in the District of Columbia where Montgomery County officers had stopped the man wearing a green Army jacket, and she learned of the updated description of the suspect by 6:20 A.M.

Officer Krieger then drove northbound, back towards Western Avenue, which divides Maryland and the District of Columbia. At the corner of Broadbranch and Rittenhouse, which is in the District of Columbia, she saw someone who matched the suspect's description as he appeared near a well-lit bus stop. She saw no other pedestrians in the entire area.

From a distance of fifty feet Officer Krieger did not recognize the suspect. The man did not remain standing on the sidewalk, however, but crossed in front of the police van. Officer Krieger then recognized the suspect as John Swain, the appellant, who worked as a mechanic at a local Chevron station. Mr. Swain had previously serviced Officer Krieger's car, and they had frequently seen each other when she stopped at the Chevron station wearing her uniform on duty.

As Mr. Swain approached the driver's side of her van,

Officer Krieger called to him by name. He responded by asking, "You are looking for me, aren't you?" Officer Krieger responded, "Yes," because, as she later testified, she knew of an outstanding warrant or criminal summons for Mr. Swain's arrest in a different matter, and because she knew that he fit the description of the homicide suspect.

Concerning their subsequent conversation Officer Krieger stated:

> "I said, 'Are you hurt?' Prior to this, the radio transmissions earlier were that the subject might have hit the windshield and may have had some head injury, so I asked him if he was hurt, and I think he said, 'No,' and then I said something to the effect of, 'Get in the car,' and just before that he said, 'Is she dead?' I either said, 'Yes,' or 'I don't know.' And then he walked across the front of the van to get in, and I unlocked the door to let him in. . . .

> [O]nce John got in the van, he put up his hands, and he said, 'I don't have a gun.' I said, 'Where is it for my benefit and my safety?' He said, 'I threw it down the hill and I ran.' I said, 'Near the car?' meaning near the accident, and he said, 'Yeah,' and I said, 'Don't tell me anymore right now. I will ask you again later,' and then I patted him down, and I said, 'I am going to have to cuff you.' He said, 'Yeah, I know.'

> He said, something to the effect of, 'Don't let them hurt me,' or 'Stay with me.' I told him not to worry, that everything would be okay, and we would get it all straightened out."

At 6:31 A.M., while John Swain walked toward the passenger side of the van, Officer Krieger radioed that she had "the suspect in custody." She drove to Western Avenue and Broadbranch and was met by Montgomery County officers who brought the eyewitnesses for a show-up with Mr. Swain, and by District of Columbia police who were then "maintaining control of him." He was taken into custody by

detectives of the Second District Metropolitan Police Department, but returned to Montgomery County that evening following a waiver of extradition.

Additional facts concerning the case will be presented with the discussion of the issues.

## I. Fresh Pursuit

The appellant, John Swain, filed a pretrial motion to suppress evidence obtained in connection with his arrest. He contended at the pretrial hearing that his arrest occurred in violation of the District of Columbia Fresh Pursuit Act, D. C. Code §§ 23-901 through 23-903 (1973).

Section 23-901 of this act authorizes:

"Any member of a duly organized peace unit of. any State (or county or municipality thereof) of the United States who enters the District of Columbia in fresh pursuit and continues within the District of Columbia in fresh pursuit of a person in order to arrest him on the ground that he is believed to have committed a felony in such State shall have the same authority to arrest and hold that person in custody as has any member of any duly organized peace unit of the District of Columbia to arrest and hold in custody a person on the ground that he is believed to have committed a felony in the District of Columbia. This section shall not be construed so as to make unlawful any arrest in the District of Columbia which would otherwise be lawful."

Section 23-903 defines the term "fresh pursuit", stating:

"For purposes of this chapter, the term 'fresh pursuit' shall include fresh pursuit as defined by the common law, also the pursuit of a person who has committed a felony or one whom the pursuing officer has reasonable grounds to believe has committed a felony. It shall also include the pursuit of a person whom the pursuing officer has reason-

able grounds to believe has committed a felony, although no felony has actually been committed, if there is reasonable ground for believing that a felony has been committed. Such term shall not necessarily imply an instant pursuit, but pursuit without unreasonable delay."

Applying this definition to the facts presented at the pretrial hearing, the hearing judge ruled that Mr. Swain was lawfully arrested. The judge stated that:

"As to the fresh pursuit, considering the totality of the circumstances here, and in reviewing the law that I have been supplied with, I am satisfied that this is certainly fresh and certainly I can't believe that in order for it to be a pursuit, that it is necessary that a police officer initially see the alleged suspect in one area and follow him across the line into another area.

There are certainly circumstances as we have here that because of police communications, that Officer Krieger got information that I guess she was pursuing once she got down in D.C., and she knew who she was looking for. And much to his regret, she found him. I am satisfied that this was fresh pursuit as envisioned by the D.C. statute, and that she had probable cause when she found Mr. Swain in D.C. some two, or three, four blocks from the D.C. line to arrest him."

On appeal Mr. Swain renews his challenge of the legality of his arrest. He submits that when the Montgomery County Police obtained permission to enter the District, until the moment of the arrest by Officer Krieger, she and her fellow officers were not in "pursuit" of anyone. Rather, the appellant contends, the police were only conducting a search.

The appellant distinguishes a pursuit from a search in that a pursuit connotes the chasing of an object which has already been discovered and a search precedes its discovery. In response, the State calls the appellant's criterion "an

artificial distinction," and contends that the D. C. statute does not require continuing surveillance of a suspect or an uninterrupted knowledge of his location.

The meaning of "fresh pursuit" must be construed according to the purpose of the D. C. statute. Its purpose is the protection of the District citizens by allowing surrounding jurisdictions' police to enter the District when they are in "fresh pursuit" of one whom the police has reason to believe has committed a felony and has subsequently crossed the D. C. line. The D. C. city limit is an artificial political border which criminals do not respect and use to their own advantage when committing crimes. In many cases the effect of the statute will be a much quicker apprehension of the suspect, who is potentially dangerous to D. C. citizens, than would occur if the foreign police were required to stop at the D. C. border and notify the D. C. police, through normal bureaucratic channels, of the description of the suspect, his last location and direction of travel, the crime involved, his propensity for violence, etc. The statute's purpose is accomplished by allowing a neighboring police department to continue its activities, whether characterized as a pursuit or a search, into the District whenever the totality of the circumstances makes it more reasonable for it to do so than to notify the D. C. police, who would then have to begin the pursuit or search anew. *See* The Council on State Government, *The Handbook on Interstate Crime Control* (rev. ed. 1966) 119, *quoted in Hutchinson v. State,* 38 Md. App. 160, 168, 380 A.2d 232 (1977), *cert. den.,* 280 Md. 734 (1978). The statute obviously encompasses a bumper-to-bumper high speed chase across the District line and just as obviously does not encompass looking for a Baltimore City robbery suspect in the District on a mere hunch. This case falls between the two extremes and we must decide how to determine whether or not it falls within the statute.

The first requirement is contained in the statute itself, that the police have reasonable grounds to believe that the suspect has committed a felony. *See* D. C. Code §§ 23-901 through 23-903 (1973). In this case Officer Krieger testified

that she drove into the District after hearing the police broadcast of a suspected murder and that a black male had been seen running from the victim's car. Thus, the first requirement is met.

The second requirement is also enunciated in the statute: "[fresh pursuit] shall not necessarily imply an instant pursuit, but pursuit without unreasonable delay." D. C. Code § 23-903 (1973). The police must pursue within a reasonable period of time. If they do not have sufficient clues immediately at hand to enable them to pursue the suspect, they obviously cannot do so. But upon receiving information sufficient to make a pursuit possible, they must do so, otherwise they would be just as effective if they notified the D. C. police about the information and allowed them to do the pursuing.

In *Hutchinson v. State, supra,* 38 Md. App. at 168-69, we applied the D. C. Fresh Pursuit Act and relied on *Kansas v. Tillman,* 208 Kan. 954, 494 P.2d 1178 (1972), because both Kansas and Missouri had enacted the Uniform Act on Fresh Pursuit, as had the District. In *Tillman* a private citizen followed two armed robbers from Kansas into Missouri and notified police in both states of the location of the abandoned getaway car. Missouri police determined that the car was owned by a Missouri car rental agency which had rented it to one Gratten. Kansas police first staked out Gratten's residence, then proceeded to the rental agency and arrested the suspects after being informed that they had been seen there. The police had gone to the scene of the robbery, learned of the location of the getaway car, proceeded to that location, staked out the suspect's residence, proceeded to the car rental agency, and finally arrested the suspects. The court held that there was no unreasonable delay. The police pursued from clue to clue in a diligent manner.

In *Sixfeathers v. State,* Wyo., 611 P.2d 857 (1980), four suspected felons were reported to be headed east on a certain highway at 2:46 a.m. Police began to search for them. At 3:27 a.m. a private citizen reported that persons similar to the suspects' descriptions had tried to obtain gasoline from

him. Police searched about two miles beyond their reported location, about three miles into South Dakota, and arrested the suspects. The court held that the 41 minute delay between the first and the second report was not an unreasonable delay, citing as factors the few policemen available, the diligence of the police investigation, and the dangerous propensity of the suspects. *Id.* at 862.

In the present case, the record clearly shows to us that the Montgomery County police acted without unreasonable delay in apprehending Mr. Swain within an hour of the shooting of Ms. Logan.

The third requirement is that the police act continuously, without interruption from the beginning of their response. The reason for this requirement is the same as that for the second requirement: if the police cease their active pursuit and investigation then the reason for allowing Maryland police to cross the District line, to allow a more efficient pursuit and quicker apprehension of the suspect, disappears and the District police could carry out the investigation just as efficiently. A federal court has characterized this criterion as calling for "an unbroken search." *Reyes v. Slayton,* 331 F. Supp. 325, 327 (W.D. Va. 1971). There the court held that a petitioner was lawfully arrested by municipal police who rapidly followed successive clues beginning with a simple description of the suspect, which led them outside their jurisdiction in close pursuit. *Accord, Maine v. Carey,* Me., 412 A.2d 1218 (1980). There is every indication in the present case that Officer Krieger's conduct in response to the shooting was persistent and continuous.

Depending on the circumstances of the factual situation with which the police are faced, other factors may determine if police action meets the "fresh pursuit" test. The Supreme Court of Wyoming came to the same conclusion when it said:

"The nature of the crime, the activities and location of the pursuer after receiving a report of the commission of the crime, the activities and location of the pursued after commission of the crime, whether

or not the pursued had been identified or would escape, the extent and nature of the evidence connecting the pursued with the crime, and the potential for the pursued to cause immediate and additional injury or damage to others are examples of the circumstances to be considered in the determination as to whether or not the pursuit was without unreasonable delay." *Sixfeathers v. State,* 611 P.2d at 861 (citing cases).

In this case several factors qualify the police action as fresh pursuit. The police knew from the radio broadcast that the suspect they were looking for was wanted for murder. The more heinous the crime, the more important it is to apprehend the suspect. Because the suspect had already committed one murder, he might have little hesitance about committing more deadly assaults. The greater the danger to the public safety, the more important it is to apprehend the suspect quickly. The only clue the police had as to the identity of the suspect was a physical description. The chances of apprehending him in the early morning daylight hours were great because the suspect was last seen on foot by an eyewitness minutes earlier and there were few other people on the street. As time progressed, the suspect would be likely to leave the immediate area and more people would be on the street, thus making apprehension of the suspect less likely. The greater the chance that the suspect will escape unless apprehended immediately, the more important it is that the police act quickly and cross the D.C.-Maryland border.

For these reasons, the police actions in this case were reasonable and within the statute because good police work required them to cross the D.C. - Maryland border to apprehend the murder suspect instead of alerting the D.C. police and letting them handle the investigation. We reject the appellant's contentions that the police must know the suspect's name or keep him in sight during the pursuit. Criminals do not often leave their name and escape route with the victims of their crimes. To dictate such requirements to the police would unnecessarily hamper the appre-

hension of criminals and restrict the scope of the fresh pursuit act, eviscerating its purpose.

## II. Miranda rights

At the appellant's pretrial hearing Officer Krieger testified that John Swain made a series of inculpatory statements. The statements made before his arrest as he approached Officer Krieger's van were not suppressed because these transpired before any custodial interrogation. The statements made to her after he entered her van and was arrested, but before he was advised of his rights under *Miranda v. Arizona,* 384 U.S. 436 (1966), were suppressed. The appellant was informed of his rights by Officer Krieger after he was placed in the custody of the District of Columbia police. Officer Krieger testified that the appellant did not say yes or no in response to her advice, but she knew that he understood what she had said. Police Sgt. Schirf, who questioned the appellant a few minutes after the appellant was informed of his rights, testified that Mr. Swain responded by saying "Yes" when asked if he understood his rights. The appellant subsequently answered questions concerning the shooting and the location of the murder weapon. These statements were found to be admissible.

On appeal, Mr. Swain contends that he did not waive his *Miranda* protection against self-incrimination, and that both his statements and the handgun he used should have been suppressed. We disagree with this contention and find no error in the rulings of the hearing judge.

The reason for the Supreme Court's decision in *Miranda* was to provide safeguards for persons suspected or accused of crimes in order to combat the "compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely." *Id.* at 467. The Court said that "a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and the right to retained or appointed

counsel. *Id.* at 475. "[T]he question of waiver must be determined on 'the particular facts and circumstances surrounding that case, including the background, experience and conduct of the accused.' *Johnson v. Zerbst,* 304 U.S. 458, 464." *North Carolina v. Butler,* 441 U.S. 369, 374-75, 99 S. Ct. 1755, 60 L.Ed.2d 286 (1979). *Butler* said that "an express statement can constitute a waiver, and that silence alone after such warnings cannot do so [,] [b]ut . . . *[Miranda]* did not hold that such an express statement is indispensable to a finding of waiver." 369 U.S. at 373. *Butler* held that "silence, coupled with an understanding of his rights and a course of conduct indicating waiver," may support a conclusion that a defendant has waived his rights. *Id. Butler* reiterated that the prosecution has the burden and it is a heavy one. *Id.*

We are satisfied that the *Butler* test is met here even though Officer Krieger's explanation of the appellant's *Miranda* rights was met by his silence. She testified that she knew the appellant and knew that he understood his *Miranda* rights. We need not determine whether this is sufficient to satisfy the *Miranda* requirement because whatever acknowledgment on the part of the appellant that he understood and waived his rights that may have been lacking was cured by Sgt. Schirf's asking the appellant less than five minutes later, "I understand that you have been advised of your constitutional rights by Officer Krieger." The appellant shook his head in an up and down manner. Then Sgt. Schirf asked the appellant, "Did you understand those rights?" The appellant answered, "Yes." This is not a case where there was no evidence presented as to whether the defendant below understood and waived his rights. *See Tague v. Louisiana,* 444 U.S. 469, 100 S. Ct. 652, 62 L. Ed. 2d 622 (1980). The fact that appellant contends that he requested an attorney some fourteen hours later and refused to talk further to the police is simply irrelevant to the question of whether the *Miranda* test was satisfied at the time in question.

### III. Medical Treatise

At the appellant's trial, the prosecution called a psychiatric expert, Dr. Abbas. During direct examination of this witness, the Assistant State's Attorney asked Dr. Abbas if he was familiar with the Diagnostic and Statistical Manual, Third Edition, (DSM-3). References to this text had previously been made by defense experts. Defense counsel objected to the question presented to Dr. Abbas; the objection was overruled and the witness was permitted to answer affirmatively to the subsequent question of whether the DSM-3 discussed anti-social personality. The trial court did not permit the expert to read from the text. Consequently Dr. Abbas limited his discussion to the diagnostic criteria of anti-social personality, and did not refer to the text. The appellant, relying on *Nolan v. Dillon,* 261 Md. 516, 537, 276 A.2d 36, 47 (1971), contends that the prosecution accredited the testimony of its expert by the mention of the DSM-3 text, and that the defense was harmed by its inability to cross-examine the authors of the text.

We find no merit to this contention. The reference to the text, which previously had been mentioned, served at most to refresh the recollection of the expert and to focus the line of questioning to a specific topic. It did not serve to bolster the expert witness's credibility. At all times the evidence was elicited from the expert and not from the text, therefore, the appellant was not denied his Sixth Amendment right, through the Fourteenth Amendment, to confront the witnesses against him. *Nolan v. Dillon* merely refused to admit journal articles into evidence or to sanction their use in direct examination. In this case the text was neither admitted into evidence nor used in direct examination.

### IV. Opinion Testimony

Dr. Abbas explained the procedure at Clifton T. Perkins Hospital that resulted in his opinion as to John Swain's sanity and capacity. This procedure included discussion between Dr. Abbas and a psychologist, Mr. Stone, who was not

certified under the Psychologists Certification Act, Md. Code Art. 43, § 618, *et seq.* (1957, 1980 Repl. Vol., 1980 Cum. Supp.), and therefore could not testify on the ultimate issue of criminal capacity. *See* Cts. & Jud. Proc. Art. 9-120 (1974, 1980 Repl. Vol.) and *Conn v. State,* 41 Md. App. 238, 396 A.2d 323 (1979).

Defense counsel objected to the State's examination of Dr. Abbas about opinions expressed in a report made by Mr. Stone to Dr. Abbas. The objection was overruled and Dr. Abbas testified that Mr. Stone reported that the appellant did not cooperate in the tests done by Mr. Stone. These results contributed in part to Dr. Abbas' expert opinion on criminal capacity.

The appellant contends that the State should not have been permitted to make any use of Mr. Stone's finding because Mr. Stone was not a qualified expert. We disagree with the appellant's contention. Clearly the ultimate issue of the appellant's mental condition was addressed by Dr. Abbas who testified to the numerous bases for his opinion, one of which was Mr. Stone's report. We find no requirement in the law that an expert witness must only rely on the assistance of personnel who could be qualified as experts. Such a requirement would require an expert witness to perform all of his subordinates' tasks himself. *See* Fed. R. Evid. 703 (expert witness may rely on facts or data not admissible in evidence "if of a type reasonably relied upon by experts in the particular field").

In this case, Dr. Abbas' testimony concerning Mr. Stone's report did not seek to establish that Mr. Stone's report was true or that it was directly dispositive on the issue of appellant's sanity. The former would be barred by the hearsay rule; the business records exception would not apply because the report itself was not introduced. *See also Gregory v. State,* 40 Md. App. 297, 326-27 (1978) (hospital report diagnosing defendant as criminally responsible inadmissible because it violated the confrontation clause of the Sixth Amendment and Article 21 of the Maryland Declaration of Rights); *Grover v. State,* 41 Md. App. 705, 710 (1979). The latter would be barred by the rule which permits

only persons certified under § 9-120 of the Courts Article to testify on the ultimate issue of criminal capacity. *See id.* The State questioned Dr. Abbas as to the bases of his expert opinion. One such basis was Mr. Stone's report. An expert witness may be questioned as to the basis upon which his opinion is based because the credibility of the expert's opinion is no better than the soundness which his reasons warrant. *See, e.g., A. H. Smith Sand & Gravel v. Dep't.,* 270 Md. 652, 667, 313 A.2d 820, 828 (1974). Mr. Stone's report was one of two such reports which indicated that the appellant did not cooperate with the persons who administered certain psychological tests, and, along with other factors, upon which Dr. Abbas concluded that "based on a reasonable medical certainty . . . Mr. Swain was able to intentionally do a wrongful act to another without legal excuse or justification."

## V. Jury Instruction

The trial judge instructed the jury that "malice"

"means an act done intentionally and without legal excuse. Malice may be either expressed or implied. It would be express malice if there was an actual intent to cause the death of the person killed or the death of another person.

The malice may be implied if the evidence shows an actual intent to inflict great bodily harm, or when the act is willfully done and the natural tendency of the act is to cause death or great bodily harm, or when there is a homicide and a deadly weapon is used, particularly when it is directed at a vital part of the body."

The defense counsel excepted to this instruction on the ground that it inadequately explained "malice," and failed to recognize that the State, to prove malice, must prove the absence of justification, excuse, or mitigation. The State argued below that the issues of justification and mitigation had not been raised, and that any deficiency in regard to

excuse was cured by the court's instruction that the State must prove the appellant's sanity beyond a reasonable doubt. The trial court then overruled the defense objection.

On appeal the appellant contends that the "primary thrust" of his trial defense was "his incapacity to act with malice due to excusing and mitigating factors, i.e., his mental disorders." He further characterizes these disorders as establishing "the defense of diminished capacity."

We reject the appellant's contention and find no error in the trial court's jury instructions. Preliminarily we find that the theory of a diminished capacity is not recognized as a valid defense in Maryland. *Armstead v. State,* 227 Md. 73, 175 A.2d 24 (1961); *see also Pfeiffer v. State,* 44 Md. App. 49, 56-57, 407 A.2d 354, 358, n.4 (1979) (listing the jurisdictions which have and have not recognized the doctrine of diminished responsibility). Because Maryland does not recognize the validity of the appellant's chosen defense, we cannot say that any evidence supporting this defense raised a legitimate jury issue on the question of justification, excuse or mitigation. In *Evans v. State,* 28 Md. App. 640, 665-69, 349 A.2d 300, 318-320 (1975), *aff'd* 278 Md. 197, 362 A.2d 629 (1976), we determined that trial judges need not instruct juries on excuse and mitigation unless there was sufficient evidence fairly to generate a jury question. In the absence of such evidence it may actually be inappropriate for the judge to provide superfluous instructions to the jury. *Id.* at 667.

The jury in the present case was adequately informed of the State's burden of proving John Swain's sanity beyond a reasonable doubt. Likewise the trial judge correctly instructed the jury that in order to find Mr. Swain guilty of first degree murder, they needed to find that the homicide was committed intentionally and without legal excuse, such as to establish malice. *Id.* at 718, A.2d at 348; *Leach v. State,* 47 Md. App. 611, 621, 425 A.2d 234, 239-40 (1981) (citing *Evans v. State*). The jury believed the State's evidence, applied the law, and delivered the guilty verdicts.

*Judgments affirmed.*
*Costs to be paid by appellant.*